## LEWIS et al. v. AMERICAN SECURITY & TRUST CO.

(Court of Appeals of District of Columbia. Submitted March 6, 1923. Decided May 7, 1923.)

No 3909.

1. **Wills 31—Capacity to make valid deed or contract is "testamentary capacity."**

Under Code, § 1625, declaring that no will shall be valid unless the person making it be of sound and disposing mind and capable of executing a valid deed or contract, the test of testamentary capacity is the capacity of making a valid deed or contract, and it is not necessary that testator should be endowed with a high order of intellect, or even an intellect measuring up to the ordinary standards of mankind, nor is it necessary to the making of a valid will that the party should have a perfect memory, and that his mind should be wholly unimpaired by age, sickness, or other infirmities.

2. **Wills 330(1)—Charge as to testamentary capacity held correct.**

A charge that neither age, sickness, nor extreme debility affects the capacity of a person to make a will, if he retains sufficient mind and memory to know what property he owns in a general way, the persons who would be the natural objects of his bounty, and his relations toward them and the nature of the instrument he is executing, was correct, especially where the court, when the foreman of the jury asked for further instruction, stated on caveator's request that that instruction was to be considered in connection wth a prayer of caveators which stated the same rule negatively, to which no objection was made by the caveators.

3. **Wills 330(1)—Instruction as to testator's duty under certain statutes as bearing on mental capacity held correct.**

Act March 9, 1906, Joint Resolution Feb. 26, 1908, Joint Resolution Feb. 25, 1910, Joint Resolution Dec. 23, 1910, Joint Resolution March 14, 1914, and Joint Resolution April 17, 1916, for the marking of the graves of Confederate soldiers and sailors who died in Northern prisons, did not require the commissioner authorized to be appointed thereunder actually to mark the graves located by him, so that an instruction giving such interpretation in will contest proceedings, in which the caveators claimed that testator's failure while commissioner to mark any graves showed a complete mental breakdown, was correct.

4. **Wills 292—Record of proceedings to charge estate with money intrusted to testator held properly excluded.**

In will contest proceedings, the record of prior proceedings on behalf of one of the caveators to charge the estate of testator with money held by him in trust for caveator, and which resulted in a decree to that effect, in no way involved any of the issues in the will contest proceedings, and was properly excluded.

5. **Evidence 558(1)—Physician, who testified from observation and denied he was an alienist, cannot be cross-examined by hypothetical questions.**

Where a physician who was well acquainted with decedent had testified from his observation that he noticed no change in the mental powers of decedent, and had also stated that he was not an alienist, it was proper to exclude cross-examination of him by means of hypothetical questions, since his information was based on his observation, and the fact that he was a physician, while it added weight to his testimony, did not change its character.

6. **Wills 322—Requiring caveator to read letters at rebuttal stage held within court's discretion.**

Where a witness for caveatees had identified certain letters which were read to the jury by counsel for the caveatees, it was within the dis-

cretion of the trial court, and not error, to require counsel for caveators to wait until the rebuttal stage of the case before reading the other letters to the jury.

**7. Wills ⬤⟹409—Court held authorized to require security for part of cost of transcript of previous testimony as condition to inspection.**

Where the transcript of the testimony at a previous trial of a will contest had been paid for by the estate, and was in the hands of counsel for the caveatees, it was not error for the court to impose as a condition to the right of counsel for caveators to inspect the transcript that they file an undertaking conditioned to pay one-half of the cost of the transcript, in the event that final adjudication was adverse to them.

Appeal from the Supreme Court of the District of Columbia.

Caveat by John S. Lewis and others against the American Security & Trust Company, executor of the will of Samuel E. Lewis, deceased. From a decision admitting the will to probate, caveators appeal. Affirmed.

C. H. Merillat, of Washington, D. C., for appellants.

W. C. Clephane, J. W. Latimer, and G. L. Hall, all of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decree in the Supreme Court of the District admitting to probate and record a paper dated May 13, 1916, as the last will and testament of Samuel E. Lewis, deceased.

Testator, who never had married, died in the District of Columbia in November of 1917, at the age of about 79 years, leaving an estate of the value of about $100,000, which, so far as the record discloses, he had accumulated. He left surviving him, as his heirs at law and next of kin, two brothers and three sisters, John S., Thomas D., and Mary Frances Lewis, Marion J. Riggles, and Emma V. Dutton. The only evidence as to his relations with his brothers and sisters concerned his sister Mary Frances, with whom he was on terms of intimacy.

In 1884 testator retired from business (that of a pharmacist), and thereafter, in addition to caring for his property, interested himself in the enactment of legislation for the location, marking, and care of the graves of Confederate soldiers. Numerous acts of Congress relating to this subject were enacted subsequently, to which reference will be made later. In April of 1914, at the age of about 75 years, testator was appointed by the Secretary of War as "Commissioner of Confederate Graves," at a salary of $5,000 per year, which position he held until August of 1917, when he resigned.

In 1910 testator executed a will, in which he made substantially the same disposition of his property as by the will in issue. To this will he added a codicil in 1914, without, however, affecting the general disposition of his property. The substantial provisions of the will before us directed the payment to an old family servant of $25 per month

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

during her life, and the balance of the income, or all of the income after the death of the servant, to his sister, Mary Frances Lewis, and upon her death the remainder to the Medical Department of George Washington University, or, in the event such a department had not been incorporated, to the University for the use of its medical department. The appellee Trust Company was named as executor.

All the brothers and sisters of the testator filed caveats to the will, raising the following issues: First. Whether the paper writing was duly executed and attested; second, whether the testator was "of sound mind, memory and understanding, and capable of making a valid deed or contract"; third, whether the execution of the will was procured by fraud; and, fourth, whether the will was procured by undue influence.

By direction of the court, and without objection by the caveators, a verdict was returned for the caveatees on the first, third, and fourth issues; there being no evidence to support those issues. The sole remaining issue, therefore, was that of testamentary capacity.

[1] Section 1625 of the Code declares that:

"No will, testament, or codicil shall be good and effectual for any purpose whatever unless the person making the same be, * * * of sound and disposing mind and capable of executing a valid deed or contract."

It is apparent from this language, as was held in Barbour v. Moore, 4 App. D. C. 535, 547, that the test is whether the testator, at the time of executing the paper purporting to be his will, was capable of making a valid deed or contract. As observed in that case, the right to make a will disposing of property in accordance with one's desires, "even to gratify partialities or prejudices," is among the most prized privileges secured by the law. The court added:

"To make a valid will it is not necessary that the testator should be endowed with a high order of intellect, or even an intellect measuring up to the ordinary standards of mankind. Nor is it necessary to the making of a valid will that the party should have a perfect memory, and that his mind should be wholly unimpaired by age, sickness or other infirmities. If the party possess memory and mind enough to know what property he owns and desires to dispose of, and the person or persons to whom he intends to give it, and the manner in which he wishes it applied by such person, and, generally, fully understands his purposes and the business he is engaged in, in so disposing of his property, he is, in contemplation of law, of sound and disposing mind."

Substantially the same test is applied in Maryland. Lyon v. Townsend, 124 Md. 163, 91 Atl. 704.

It is unnecessary to examine the decisions in other jurisdictions, since we regard the rule here to be substantially embodied in the authorities already cited. However, it may be observed in passing that in 40 Cyc. 1004, we find:

"The rule to determine testamentary capacity is that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate, and which he intends to dispose of, and to recollect the objects of his bounty."

And in 28 R. C. L. at page 86, it is said:

"Perhaps the shortest and almost universal rule given for determining testamentary capacity is that the testator must be able to understand the business in which he is engaged when he makes his will, and to appreciate the effect of the disposition made by him of his property."

In an action to set aside a will of property acquired by a lifetime of effort and possible sacrifice, frailties and peculiarities common to mankind often are seized upon, magnified, and held up to court and jury, the testator's voice being stilled by death, as convincing evidence of mental incapacity. Adverting to this, Mr. Justice Brewer, speaking for the court in Beyer v. Le Fevre, 186 U. S. 114, 125, 22 Sup. Ct. 765, 770 (46 L. Ed. 1080), said:

"One who is familiar with the volume of litigation which is now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. * * * The expressed intentions of the testator should not be thwarted without clear reason therefor."

[2] In the light of the foregoing, we will now consider appellants' contention that the court erred in its charge to the jury as to mental capacity. At the request of the caveatees, the jury was instructed (caveatees' prayer No. 7) that neither age, sickness, nor extreme debility will affect the capacity of a person to make a valid will, if he retains sufficient mind and memory to know:

"(1) What property he owns in a general way; (2) the person or persons who would be the natural objects of his bounty and his relation towards them; and (3) the nature of the instrument he is executing; and if they believe from the evidence that Samuel E. Lewis possessed sufficient mentality to meet these requirements their verdict should sustain his will."

The court also granted, at the request of the caveators, a prayer (caveators' prayer No. 1) in which the jury was instructed that if the testator "did not have sufficient mind and memory to know in a general way the extent and nature of his property, and who were the natural objects of his bounty and their deserts, if any, with reference to their conduct toward him and their treatment of him, and what were their relative claims upon his bounty, if any, and necessities, and generally to understand the business he was engaged in when executing the paper writing in controversy in disposing of his property," the jury should find want of testamentary capacity.

Subsequent to the submission of the case to the jury, at their request they were brought into court, whereupon the foreman read caveatees' prayer No. 7 and inquired whether, if the jury should find that the decedent knew the three things therein referred to, they should find he was of sound mind. To this inquiry the court replied:

"That prayer undertakes to state the sort of mind, the sort of mental condition, that a person must possess at the time of making his will, and if his state of mind is such that he can grasp the things stated in those three numbered sentences or phrases, then, if the jury find from the evidence that he had such a mind, their verdict should be as the prayer directs."

Thereupon counsel for the caveators—

"interrupted and remarked in the presence and hearing of the jury that of course caveatees' prayer No 7 had to be read and taken in connection with caveators' prayer No. 1 as granted, and that the jury must also find from the evidence those things which were set forth in caveators' said prayer No. 1."

To this the court replied in the affirmative—

"and then further said to the jury that in the prayer called to his attention by their foreman the matter was stated in a positive form, while in caveators' prayer No. 1 it was in the negative form; that the prayers approached the question from the different points of view of the parties, but the same legal principle was involved in both."

To this action of the court no objection or exception was interposed by counsel for either side. In view of the foregoing, it is difficult to perceive what basis appellants have for their present contention. While the phrase in caveatees' prayer, "the nature of the instrument he is executing," was less intelligible than the phrase "and generally to understand the business he was engaged in," as found in caveators' prayer No. 1, the jury, as we have seen, were expressly instructed to consider both prayers, and therefore could not possibly have been misled. Evidently counsel then were of this mind, for there was complete acquiescence on their part. It is unnecessary to pursue this question further.

[3] It is next contended that the court placed a "wholly unwarranted construction" upon the statutes relating to the location, listing, and care of the graves of Confederate soldiers. The original act, approved March 9, 1906 (34 Stat. 56), is entitled:

"An act to provide for the appropriate marking of the graves of the soldiers and sailors of the Confederate army and navy who died in Northern prisons and were buried near the prisons where they died, and for other purposes."

In this act the Secretary of War was authorized and directed to ascertain the locations and condition of such graves, in his discretion to acquire possession or control over all graves where such dead were buried, not then possessed or under the control of the United States government—

"to cause to be prepared accurate registers in triplicate * * * of the places of burial; * * * to cause to be erected over said graves white marble headstones similar to those recently placed over the graves in the 'Confederate section' in the National Cemetery at Arlington, Virginia, similarly inscribed; to build proper fencing for the preservation of said burial grounds, and to care for said burial grounds; * * * the said work to be completed within two years, at the end of which a report of the same shall be made to Congress. * * * The Secretary of War is hereby authorized and directed to appoint some competent person as commissioner *to ascertain the location of such Confederate graves not heretofore located, and to compare the names of those already marked with the registers in the cemeteries, and correct the same when found necessary, as preliminary to the work of marking the graves with suitable headstones.* * * *" (Italics ours).

By Joint Resolution of February 26, 1908 (35 Stat. 567), the Act of March 9, 1906, was extended for two years. The Joint Resolution

of February 25, 1910 (36 Stat. 875), granted an extension for an additional year and contained the proviso:

"That the Secretary of War may cause to be erected at the head of each grave of a citizen or civilian prisoner of war who was buried among the soldiers a headstone of the size and dimensions of those placed at the head of the soldiers' graves. * * * "

Under the Joint Resolution of December 23, 1910 (36 Stat. 1453), there was a further extension of two years. By Joint Resolution approved March 14, 1914 (38 Stat. 768), the provisions of the earlier Act were revived and continued in force for a period of two years, and, in addition, were made to—

"include and apply to the graves of Confederate soldiers and sailors lying in all national cemeteries and cemeteries at federal military stations, or localities throughout the country."

Under the Joint Resolution of April 17, 1916 (39 Stat. 52), the prior resolution was continued for two years additional, with the further proviso:

"That the triplicate registers provided for in the original act shall include the time and place of death of each Confederate soldier prisoner of war."

It is in evidence that the testator was a surgeon in the Confederate Army, and, as already indicated, greatly interested and instrumental in the procurement of the legislation just set forth, but that while commissioner he did not actually mark any graves. It is the contention of the caveators that it was his duty under the law to so mark graves, and that his failure in this regard, in the circumstances, was evidence of "the complete breakdown of decedent in the performance of his duties as commissioner." In other words, it is contended that this was evidence of failing mental powers. The court, after giving a correct synopsis of the foregoing legislation, said:

"It was the duty of the late Samuel E. Lewis, as commissioner, to ascertain the location of graves, not theretofore located, of soldiers and sailors of the Confederate army and navy who died in federal prisons and military hospitals in the North and who were buried near their places of confinement, and of those lying in all national cemeteries and cemeteries at federal military stations, or localities throughout the country, and to compare the names of those already marked with the registers in the cemeteries, and correct the same when found necessary."

This, in our view, was a correct interpretation of these enactments, and the fact that prior commissioners or even other officials may have entertained a different and incorrect opinion did not bind either the testator, when he became commissioner, or the court at the trial. There was no evidence that the testator, while commissioner, ever was authorized or directed to do what it now is contended was his duty to do, that is, actually mark graves.

[4] Dr. Lewis had for many years managed the business affairs of his sister, Mary Frances Lewis, and after his death certain notes, representing trust funds held by testator for his sister, were not found. Thereupon a proceeding in equity was filed for a decree authorizing the collectors of the estate to reimburse the sister. In this petition it

was not alleged that Dr. Lewis was of unsound mind, and there was no finding on that question by the master to whom the case was referred. In his report the master found that Dr. Lewis, at the time of his death, was indebted to his sister in the sum of $7,310, with interest; that he held this money as agent or trustee of his sister; that this indebtedness originally was evidenced by promissory notes—

"which notes were canceled on September 18, 1915. Why this was done is not shown. * * * The testimony discloses the existence of no later written evidence of this indebtedness or any part thereof."

The refusal of the court to permit the introduction of the entire record, or at least the pleadings, report of the special master, and decree of the court in the former proceeding, is specified as error. But just what bearing the equity proceeding would or could have had in the will contest it is difficult to perceive. That was a suit to charge the testator's estate with an indebtedness, resulting in a decree to that effect, a purely collateral proceeding, in no way involving any of the issues before the court in the will case. See Wahle v. Wahle, 71 Ill. 510. Moreover, for aught that appears, the witnesses in the equity case were available to the caveators here, and it is significant that the sisters, Mary Frances Lewis and Marion J. Riggles, "did not testify at any time during the trial, and no evidence was introduced to account for their nonproduction."

[5] During the introduction of evidence by the caveatees, Dr. Philip Roy was called to the stand, and, after he had stated that he had known decedent well, and that in his opinion he was of sound mind, was asked the following question:

"From your medical training and experience, Doctor, are you able to tell, from the appearance of persons as they grow old, when they are breaking down physically or mentally?"

To this counsel for caveators objected on the ground that it did not appear that the witness was an alienist. Thereupon the witness said he was not an alienist, and counsel for caveatees stated that it was not contended that the doctor was an alienist. The court then overruled the objection, and the witness answered the question, saying:

"I come in contact with people that I have seen year after year, and consequently can measure them from one year to the other. It seems to me that I can tell very well when their mental powers are beginning to lessen."

Counsel for caveatees then asked the following question:

"Now, please tell us, Dr. Roy, whether you observed any evidence, at any time during your acquaintance with Dr. Lewis, of that breaking down mentally which sometimes accompanies advancing years?"

Over the objection and exception of the caveators the witness answered: "I never noticed any change in him mentally at all." Thereupon counsel for the caveators propounded a hypothetical question to the witness, to which counsel for the caveatees objected, on the ground that the witness had not testified as an alienist, but that no objection would be interposed to any question based upon the observation of the witness. This objection was sustained by the court, and thereafter

the witness was interrogated, without objection, as to his observation of patients having senile dementia and other similar ailments.

The foregoing rulings were correct. The witness was not an alienist, stated that he was not, and his information was based upon and limited to observation. The fact that he was a physician added weight to his testimony, but did not change its character. See Turner v. American Sec. & Tr. Co., 29 App. D. C. 460.

[6] A witness for the caveatees identified certain letters, some of which were read to the jury by counsel for the caveatees. Apparently the witness had then left the stand. Counsel for caveators then started to read to the jury certain others of these letters, and, upon objection being interposed, the court ruled that "the letters, etc., could be read by caveators later, when it came to the rebuttal stage of the case." The record discloses that these letters "were later so read by caveators' counsel." This was a matter within the discretion of the trial court, and plainly no error was committed in the ruling made.

[7] One point remains. It appeared that there was a prior trial of this case, resulting in a disagreement of the jury, and that proceedings at that trial were taken stenographically, "the cost thereof to be borne by the estate of decedent." This transcript was under the control of the caveatees and actually in the possession of their counsel. A carbon copy was in the possession of the stenographers. Caveators sought an inspection of this transcript, or, failing in that, of the carbon copy; but counsel for caveatees declined to permit inspection of the transcript unless caveators would pay one-half the expense incurred in its procurement, and advised the stenographer to the same effect. Thereupon the matter was brought to the attention of the court by petition, requesting an inspection of the transcript, nothing being said as to the carbon copy. The court then passed an order that the inspection be permitted provided petitioners would file an undertaking running to the estate of the decedent and conditioned to pay one-half the cost of the transcript in the event the final adjudication as to the validity of the will was adverse to the caveators. The action of the court in so doing is assigned as error, it being contended that caveators were entitled, as matter of right, to inspect the transcript as a paper of the estate.

This estate, represented by the caveatees (Hutchins v. Hutchins, 48 App. D. C. 286), had incurred the expense of the transcript of the proceedings in the former case. While it would not have added to that expense, had counsel for caveatees permitted counsel for caveators to inspect that transcript, we cannot say that the condition named by the court was arbitrary or unreasonable. No order was sought or made as to the carbon copy. Possibly counsel for caveatees should not have advised the stenographers as to what arrangement they should make with counsel for the caveators regarding an inspection of that carbon copy in their hands, but that question is not before us or involved here.

Finding no error in the record, we affirm the decree, with costs.

Affirmed.