## LABOFISH v. BERMAN et al.

### No. 5462.

Court of Appeals of District of Columbia.

Argued Nov. 3, 1931.

Decided Jan. 18, 1932.

P. H. Marshall and R. E. Wellford, both of Washington, D. C., for appellant.

James B. Flynn and S. J. L'Hommedieu, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Benjamin Berman died June 21, 1929, in the sixty-fourth year of his age. Some fifteen months prior to his death he executed a will in which he devised and bequeathed an estate, estimated to be worth between forty and fifty thousand dollars, to appellant, an attorney at law, in trust to apply the income to the maintenance and support of his widow —who at the time of the execution of his will and also at the time of his death was hopelessly insane—the estate to pass after the death of the widow to five Jewish charities. Testator left surviving him two sons and two daughters whom, in his will, he describes as "adult beings, physically and mentally fit, and capable of providing for themselves." Article five of the will is devoted to a severe denunciation of the conduct of the children to the testator and his wife. It says: "They have heaped abuse upon their parents by their incivility, and in numerous ways and by divers means have ill-treated, insulted, and dishonored them. They have failed to accord to their father and mother the respect and veneration that was their due. They have hurt and injured * * * their disordered and ailing mother and have denounced and villified their aged father. * * * By all their several ways and means they have broken my health and my spirit, and it is meet and proper that I should provide for them from my bounty after my demise in proportion as they have afflicted me during my life. Out of my benevolence, therefore, I give and bequeath unto each of my aforesaid sons and daughters the sum of One Dollar, to the end that they may the better and the longer keep in mind and remembrance their many transgressions and misdoings."

Testator was an illiterate, and the language quoted is undoubtedly that of the scrivener of the will, and if the half of it is true, the disinheritance of the sons and daughters would be understandable, for, while in the deep affection of the parent much is condoned, human nature has not yet reached that height where the utter neglect and disregard of the admonition of the Fifth Commandment is ordinarily encouraged with reward. But a careful examination of the evidence in the record fails to disclose a jot or tittle of justification for the bitter condemnation of his children by testator, while, on the contrary, all four children describe their father as of poor health, subject to fainting attacks, irritable and irascible and unable properly to attend to business, abusing people who came to see him, accusing his mother and wife of robbing him, and his children of trying to poison him, cursing his mother on her deathbed and at her funeral, and, during her burial, threatening to kill himself; and themselves as dutiful and helpful and working in his store for little or no pay. In addition, ten other witnesses from the neighborhood expressed the opinion testator was of unsound mind and unable to make a will. In this state of the record it is clear the conclusion reached by the jury that testator did not possess testamentary capacity at the time of making the will is supported by all the evidence and is clearly right.

But it is insisted on the part of the executor that the court below erred in three respects: First, in permitting contestants to introduce in evidence a copy of the death certificate on file in the Bureau of Vital Stat-

istics in the city of Washington; second, in not permitting on cross-examination a hypothetical question asked the witness, Dr. Murphy; third, in refusing to permit the physician who attended testator at the time of his death to express an opinion as to his mental condition. We think none of these exceptions is well taken.

Congress, by Act June 23, 1874, 18 Stat. 283, c. 490, as amended by Act June 11, 1878, 20 Stat. 107, § 8 (D. C. Code 1929, tit. 20, § 982), made it the duty of the health officer of the District of Columbia "to enforce regulations to secure a full and correct record of vital statistics, including the registration of deaths and the interment of the dead." By Act April 24, 1880, 21 Stat. 305, § 2 (D. C. Code 1929, tit. 20, § 991), it validated the ordinances of the Board of Health of the District of Columbia, and by Act August 7, 1894, 28 Stat. 257 (D. C. Code 1929, tit. 20, § 992), declared that the same should "have the same force and effect within the District of Columbia as if enacted by Congress in the first instance."

One of these ordinances made it the duty of the board of health, whenever a person should die in the district, to require of the attending physician "to furnish and deliver to the undertaker or other person superintending the burial of said deceased person, a certificate, duly filed, setting forth, as far as the same may be ascertained, the name, age, color, sex, nativity, occupation, whether married or single, duration of residence in the District of Columbia, cause, date, and place of death," and made it the duty of the undertaker to forward the certificate to the registrar within twenty-four hours.

We think the effect of these acts of Congress is to make death certificates, in the circumstances, public records, and not mere police regulations, and, being such public records, we think they may be offered in evidence for the purpose of proving, prima facie, the time, place, and cause of death. This is clearly the trend of authority. See Hamer v. Globe Co., 243 Ill. App. 109, 117; Hennessy v. Metropolitan Co., 74 Conn. 699, 52 A. 490; McKinstry v. Collins, 74 Vt. 147, 52 A. 438; State v. McDonald, 55 Or. 419, 103 P. 512, 104 P. 967, 106 P. 444; 1st Greenleaf on Evidence, §§ 483–484; 3rd Wigmore, §§ 1642–6. But even if we should hold otherwise, the result would be the same, for the certificate showed no more than that testator's death was due to heart disease, which, of course, has no relation to sanity or insanity, and therefore could not have influenced or prejudiced the jury adversely to appellant's interests.

◾◾ The next exception relates to the action of the court in sustaining an objection to a question asked, by counsel for the executor, of Doctor Murphy, a witness for the caveators, and to the court's reply to an inquiry of counsel as to the extent to which he might go in such cross-examination. Doctor Murphy, in answer to a hypothetical question, had expressed the opinion that testator was of unsound mind when he made the will. On cross-examination he was asked to assume that testator was not "at all times of unsound mind, but upon occasions was of sound mind, and knew and understood what was going on around him and what was said to him," and, assuming these facts, if it would affect his opinion with relation to testator's ability to make a will.

The principal objection to the question, as we see it, is that it answers itself. If at the time the will was made testator was of sound mind and knew and understood what was going on, he was capable of making a will, and it would not require the evidence of a doctor or expert to aid the jury in reaching a conclusion on this state of facts. In the nature of things, the answer of the physician to the main hypothetical question was predicated upon the assumption that the condition described to him existed at the time the will was made. Some of the witnesses had testified that at periods during the times in question, that is to say, during the one and a half years between the execution of the will and his death, testator was of sound mind. Obviously, therefore, as to those periods, the physician's answer to the hypothetical question had no relation, and if the executor had offered any evidence tending to show that the will was made during a period when testator's mind was normal and the jury had believed it, that would have ended the case. But this he wholly failed to do. Hence, to ask the physician on cross-examination to assume that a man was of sound mind and follow this by asking him if, in such circumstances, he would say he was of unsound mind is merely to waste the time of court and jury and, if for no other reason, should be excluded. Undoubtedly counsel had a perfect right to interrogate the witnesses as to any facts which he claimed the evidence showed, for the rule, of course, is that where an expert has testified on direct examination to a certain state of facts, the other party on cross-examination may show that other facts had not been considered, and that a fair consideration of such other facts would affect or

alter his opinion, but, as we view the matter, the rejected question was wholly pointless and could have elicited no information helpful to the jury. The ruling of the court, therefore, in respect to it was not error.

The last exception relates to the refusal of the court to allow the physician who attended testator immediately prior to and at the time of his death to express an opinion as to his mental condition at that time. It is perhaps sufficient to say, as to this, that the issue was not the ability of the testator at a time immediately before his death to make a will, but as of the time it was made—in this case almost a year and a half prior to his death. He might have been ever so insane or ever so sane when he died without affecting his ability one way or the other to make a will a year and a half before, but we do not rest the affirmance of the lower court's action on this ground, but rather on the fact, as has been heretofore stated a number of times, that under the District of Columbia statute on the subject, a physician may not be permitted to testify (except by the consent of the patient or his legal representatives) as to any matter which has come to his knowledge strictly out of his professional relationship to the patient. The statute, section 1073, Code 1924 (D. C. Code 1929, tit. 9, § 20), provides that he shall not be permitted to disclose "any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity." We do not understand this language to make the physician ineligible as a witness under all circumstances, for instance, we think it clear that he may testify as to his employment by the patient, and, by virtue of the statute to which we have referred in passing on the first exception, to the time, place, and cause of death, because the law makes this a public record. But as to all knowledge or information acquired by him through disclosures made by the patient, as well as information obtained through his observation or examination of the patient and to all inferences and conclusions drawn therefrom, we think the statute seals his lips, and this because the relationship of itself is and ought to be in its nature confidential. The answer to the question asked of the witness in this case necessarily would violate this rule. The court was correct in refusing to allow it to be answered.

The decree of the lower court should therefore be, and is, affirmed, with costs.

Affirmed.