**THOMPSON v. SMITH.**
No. 7206.

United States Court of Appeals for the District of Columbia.
Decided Feb. 27, 1939.

Petition for Rehearing Denied
March 28, 1939.

---

[4] As was said in the Shannahan case, page 599, 58 S.Ct. 732.

the will. Donald D. Thompson, who was the third son of the decedent, the executor, and persons unknown were designated as defendants. The executor answered. Upon the pleadings three issues were framed: (1) was the paper writing the last will and testament of Wena D. Thompson; (2) was Wena D. Thompson at the time of making and subscribing the paper writing of sound and disposing mind and capable of executing a valid will; and (3) was the paper writing obtained or its execution procured by fraud, coercion and undue influence of Donald D. Thompson or others unknown. The case was tried before a jury. At the close of the evidence, the court told the jury that the caveator had made no case under the third issue and instructed the jury to answer that in the negative. This the jury did. The other two issues were submitted to the jury and the verdict was in the affirmative upon each. The court then entered the order appealed from. Of numerous errors assigned only those hereinafter discussed were argued in the appellant's brief. We treat the others as abandoned. We state below further facts pertinent to the particular errors argued. .

## I.

On the issue of mental competency, the caveatee offered as witnesses two physicians who had attended the decedent during her lifetime. Objection to their testimony was made by the appellant upon the ground that it was within the privilege established by statute for confidential information acquired by a physician in attending a patient. But the appellee stated that, as executor, he waived the privilege, and the physicians were permitted to testify. The appellant urges that the executor could not lawfully waive the privilege and that the court therefore erred in admitting the testimony.

We think that the ruling of the trial court was correct. The statute in question provides:

"Sec. 1073. Physicians, Testimony of. —In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representatives, to disclose any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity . . . ." [31 Stat. 1358, D.C.Code (1929) tit. 9, § 20]

Wm. E. Leahy and James F. Reilly, both of Washington, D. C., for appellant.

Alfred L. Bennett and John Lewis Smith, Jr., both of Washington, D. C., for executor.

Before STEPHENS and EDGERTON, Associate Justices, United States Court of Appeals for the District of Columbia, and WHEAT, Chief Justice, District Court of the United States for the District of Columbia.

STEPHENS, Associate Justice.

This is an appeal from an order sustaining a will. The decedent, Wena D. Thompson, died in the District of Columbia December 1, 1936, leaving a paper writing designated her last will and testament, dated December 13, 1935. The paper writing nominated the caveatee, John Lewis Smith, executor. In the usual course this purported will was offered for and admitted to probate and letters testamentary were ordered issued to the executor named; and upon the filing of an undertaking required of him by the probate court, they were issued. Thereafter, the appellant John W. Thompson, who was the eldest son of the decedent, filed a caveat to

938

The statute is not lacking in clarity. The phrase "legal representatives" has an accepted meaning which includes "executor." See Briggs v. Walker, 1898, 171 U.S. 466, 19 S.Ct. 1, 43 L.Ed. 243. In that case the Supreme Court said, at page 471, 19 S.Ct. at page 3: "The primary and ordinary meaning of the words 'representatives,' or 'legal representatives,' or 'personal representatives,' when there is nothing in the context to control their meaning, is 'executors or administrators,' they being the representatives constituted by the proper court. [Citing authorities]" See also 2 Jarman, Wills (7th ed. 1930) 1585; 2 Williams, Executors (12th ed. 1930) 729; Page, Wills (1901) § 533.

The appellant relies upon Hutchins v. Hutchins, 1919, 48 App.D.C. 495; Stafford v. American Security & Trust Co., 1931, 60 App.D.C. 380, 55 F.2d 542; Labofish v. Berman, 1932, 60 App.D.C. 397, 55 F.2d 1022; Westover v. Aetna Life Ins. Co., 1885, 99 N.Y. 56, 1 N.E. 104, 52 Am.Rep. 1; Reinhan v. Dennin, 1886, 103 N.Y. 573, 9 N.E. 320, 57 Am.Rep. 770; Loder v. Whelpley, 1888, 111 N.Y. 239, 18 N.E. 874; and In re Will of Hunt, 1904, 122 Wis. 460, 100 N.W. 874. We think the three local cases are not controlling and the other cases not persuasive.

Hutchins v. Hutchins, *supra*, was a will contest. At the trial the caveator, who was one of the named executors, offered the testimony of a family physician of the decedent. The caveatees, who were also named executors, objected upon the ground that the testimony was privileged under the same statute as is involved in the instant case. The trial court ruled that the privilege forbade the doctor to testify to what the decedent had said or to what he, the doctor, had learned in examining him, but the trial court permitted the doctor to make his own discrimination between such material and competent material and to testify as to the latter. On the appeal we held that it was error to permit the witness himself to make the discrimination—that the court should have done it. In discussing the statute establishing the privilege, we said that to its sweeping exclusionary effect "there is a single exception. Such testimony may be received with the consent of the patient or his legal representatives. The exception is not in this case. Hence, the proferred witness was confronted by the general pro-

hibition of the statute." (48 App.D.C. at page 500) Also at the trial the caveatees offered the depositions of certain physicians, and then the caveator raised the statutory privilege. The trial court ruled that the caveatees had established the law of the case, so far as the admission of this class of evidence was concerned, by themselves invoking the privilege against the caveator, but refused to examine the depositions to determine whether they contained competent material. On appeal we ruled that this was prejudicially discriminatory and error. We ruled also that the contention that the caveatees were the legal representatives of the decedent and as such could waive the restrictions of the statute was without merit, saying that: "While, by virtue of their appointment as executors in the will, they could appear to defend it, they were not legal representatives within the purview of the statute." (48 App.D.C. at page 502) In another connection we remarked also: "It is true that the caveatees are only executors *eo nomine* until the probate of the will, · · ·" (48 App.D.C. at page 502) It seems apparent from the foregoing, and it is made clear by reference to the record in the case, that the ruling of the court on the question of waiver of privilege by the executors was based upon the proposition that they were merely executors *eo nomine* and not *de jure*, this for lack of admission of the will to probate and formal issuance of letters. Since in the instant case letters testamentary had been issued to the executor, the Hutchins case is distinguishable, and we need not now consider whether or not it was correctly decided.

In Stafford v. American Security & Trust Co., 1931, 60 App.D.C. 380, 55 F.2d 542, no question whether a legal representative of a decedent could waive the statutory privilege was presented.

In Labofish v. Berman, 1932, 60 App.D.C. 397, 55 F.2d 1022, refusal by the trial court to allow an attending physician of a decedent to testify in a will contest was sustained on appeal under the same statute as is involved in the instant case. The testimony was offered by the caveatee who was named executor in the will. While no reference was made in the case to Hutchins v. Hutchins, the decision seems to have been upon the theory therein stated, that is, that since the named executor had not yet had letters testamentary issued to

him, he was not within the meaning of the statute a legal representative empowered to waive the privilege.

Westover v. Aetna Life Ins. Co., Reinhan v. Dennin, and Loder v. Whelpley, *supra,* were all decided under a New York statute (N.Y.C.C.P. (1876) Sec. 834, 836) which rigidly forbade a physician to disclose, after the death of his patient, information acquired in a professional capacity, and which made no exception whatever. The cases are therefore not in point. It is urged by the appellant that the New York statute was later amended so as to provide that the prohibition of the statute could be "expressly waived . . . by the personal representatives of the deceased patient, or if the validity of the last will and testament of such deceased patient is in question, by the executor or executors named in said will, or the surviving husband, widow or any heir-at-law or any of the next of kin, of such deceased, or any other party in interest." (L.1892 ch. 514) We see no relevancy to the question in the instant case in these terms of the amended New York statute.

In re Will of Hunt, 1904, 122 Wis. 460, 100 N.W. 874, involved a statute which rigidly forbade a physician to testify to information obtained in a professional capacity and which made the privilege personal to the patient and authorized no waiver by anyone for him. It was contended in the case that the statute had no application to a contest over the probate of a will. The Supreme Court of Wisconsin refused to adopt this position, and in so doing said:

"The purpose of that statute is personal. It is to protect the patient himself from disgrace or chagrin. Its effect on property rights or estate is only incidental. [Citing authorities] Such reasons do not cease upon the death of the patient. His memory and good name are still subject to injury by publication of information necessary to proper treatment by his physician, and apprehension of such enforced publication after his death may well result in reluctance or unwillingness to make those disclosures necessary for preservation of life or health which it is the policy of the statute to encourage by assurance of their secrecy. . . ." [122 Wis. at page 467, 100 N.W. at page 876]

The case is not in point because the statute involved in the instant case expressly authorizes waiver by the legal representative.

But the appellant apparently relies upon the reasoning of the Wisconsin court, and says: "It is not to be assumed that Congress placed the power of waiver in the hands of an executor, who in many cases is a total blood stranger to decedent, or a corporate executor, looking only to the interests of its stockholders," and says further: "The secrets of the sick room should remain inviolate," and if the phrase "legal representative's" is construed to include an executor, evil consequences will result such as, for example, cases in which the heirs at law may wish to waive the privilege but are powerless to do so because a stranger or corporate executor can refuse. These arguments might be pertinent if the local statute were ambiguous or might be appropriate if presented to the Congress in support of a proposed modification of the statute. They are inappropriate here.

II.

Testimony was introduced in this case on the part of the caveator to the effect that the decedent at the time of the execution of the will was in poor health, of infirm memory as to recent events, and subject to the use of hypnotic drugs, and that when under the influence of such drugs she was not mentally competent to make a will. This testimony came from the caveator, from another son and his wife, from a brother and a sister-in-law of the decedent, and also from servants, friends and a family physician. All of these had had over a substantial period of time close contact with the decedent. To the contrary for the caveatee it was testified that the decedent was mentally alert and of sound mind and competent to make a will. This testimony also came from relatives by both blood and marriage, including the son Donald Thompson, who had been designated as a defendant, and from a nurse, merchants and the like. Also the family physician testified that when not under the influence of narcotics the decedent was competent. Included within the testimony for the caveatees was that of the two attesting witnesses to the will. One of these, Jerrold B. Ullman, an employee in the office of the named executor, testified that he had visited the decedent on various occasions between March 8, 1935, when he first saw her, and December 13, 1935, the date of the execution of the will, and that he had talked with her about the payment of outstanding bills

and the preparation of her will, and that she was rational about the money she owed and discussed intelligently the provisions of her will. He admitted, however, that his visits to her were always in the afternoon and by appointment and that he knew nothing about her use of hypnotic drugs. The other attesting witness, Lewis G. Jackson, a desk clerk at the hotel where the decedent lived for approximately two years and at the time of the execution of the will, testified that he saw her on several occasions when she came to the desk for mail and messages, that she talked rationally and intelligently at the time she executed the will; but he stated also that he did not know she was addicted to the use of drugs, that his only visit to her apartment was at the time of the execution of the will—when he remained only five minutes, that otherwise he had spoken to her on several occasions for no more than a minute at a time and then concerning the mail or the payment of a bill or just in passing the time of day. This witness stated further that he did not discuss the provisions of the will with her at the time of execution and that the thought of mental incompetency never entered his mind and that he never formed an opinion at all as to whether she was of sound or unsound mind and never had any occasion to think of it. In this state of the testimony the trial court, over the objection of the appellant, instructed the jury as follows:

"The jury are instructed that if they are satisfied that Jerrold B. Ullman and Lewis G. Jackson, the two attesting witnesses to the will in controversy, are disinterested, intelligent, and truthful, then the testimony of such witnesses as to the mental condition of Wena D. Thompson at the time she executed the will, other things being equal, is entitled to more weight than that of witnesses who were not present at the time of the execution of the will. By the expression 'other things being equal,' the Court means equally credible, intelligent, and disinterested when compared with the non-attesting witnesses in the case."

This, it is asserted by the appellant, is an erroneous instruction.

We think that the appellant is correct in this contention for the reason that the instruction as phrased requires the jury to give greater weight to the testimony of the two attesting witnesses than to that of witnesses who were not present at the time of the execution of the will, provided the jury believed that the two attesting witnesses were equally credible and intelligent and disinterested when compared with the non-attesting witnesses, but this without reference to the fact that the jury might have concluded that though the attesting witness Jackson was equally credible—in the sense of truthful—intelligent and disinterested as compared with the non-attesting witnesses, it might have also concluded from his testimony that he paid no attention at the time of the execution of the will or at any other time to the question of the decedent's mental competency, and did not perform his duty as attesting witness of inquiring into her mental capacity at the time of execution. The crucial question in the case was whether or not the decedent was of sound and disposing mind at the moment of execution of the will. The testimony of attesting witnesses, because they are present at the moment of execution of the will and are under a duty to inquire into the competency of the maker of the will, may be of greater value than the testimony of witnesses who were not present at the time of execution and who were under no such duty. But while the testimony of attesting witnesses may thus be of greater value, it is not necessarily so. An attesting witness may, despite the existence of a duty to inquire into mental competency, and despite his presence at the time of execution of the will, pay little or no attention to the question of the capacity of the maker. In such event his testimony may be of no value at all or at best of less value than that of other witnesses who, though not present and under no duty to inquire into mental competency, nevertheless have long known and from constant contact have actually observed the maker of the will and formed an opinion as to his mental competency, and whose testimony might therefore support an inference as to the probable condition of mind of the maker at the moment of execution of the will. In the instant case, though we do not assume to say that the jury must have done so, we think it might well, except for the instruction complained of, have reached the conclusion that the testimony of the witness Jackson was worth little, or was at best worth less than the testimony of other witnesses in the case, and conceivably the jury might have concluded that the testimony of the witness Ullman also was worth less than

that of others. The instruction forbade the jury to reach such a conclusion.

It is not the law that the testimony of attesting witnesses must under all circumstances be given more weight than the testimony of others. That question was ruled on in King v. Rowan, 1903, 82 Miss. 1, 34 So. 325. There the trial court had refused a requested instruction which would have told the jury that the testimony of subscribing witnesses is entitled to greater weight than that of other witnesses with equal opportunity for observation. On appeal the Supreme Court of Mississippi held that the requested instruction had been properly refused and in so ruling said:

"The charge proceeds upon the idea that the mere fact of being subscribing witnesses entitled their testimony to such greater weight. It does not proceed upon the theory that the value of the testimony of such witnesses is due to the fact simply that they do actually improve the opportunity given them for the more accurate and careful observation of the testator's capacity to make a will, and all the circumstances surrounding the execution of the will. The value of the testimony of any witness depends upon his opportunity for observing the fact or facts about which he testifies, and, since subscribing witnesses are called on to witness the execution of the will and all attendant circumstances illustrative of the capacity of the testator to make a will, and to observe whether or not, though capable, he has been unduly influenced, their testimony on these points, if they did fully improve the opportunity given them for observation, is, of course, more valuable than that of witnesses who did not enjoy like opportunity for observation. But this value is based upon the fact that the subscribing witnesses have both enjoyed and improved such opportunity for observation denied to other witnesses, and not upon the simple fact that they are subscribing witnesses. Subscribing witnesses, in the varying cases, may be persons of greatly differing intelligence, and of very vastly different capacity for observing, and making proper deductions from such observation; and, besides, the opportunities which may be afforded at the time of execution of a will for such observation may differ very widely according to what may occur at the time. The chancellor, therefore, properly refused an instruction which declared the rule that the testi-

mony of subscribing witnesses was to have greater weight than the testimony of other witnesses simply because the law required subscribing witnesses 'to perform a certain duty.' It is not a question of what the law required, but of whether the facts showed that the subscribing witness was afforded the opportunity of observation, and improved that opportunity. . . ." [82 Miss. at page 13, 34 So. at page 326]

See also Crandall's Appeal, 1893, 63 Conn. 365, 368, 28 A. 531, 38 Am.St.Rep. 375; Burney v. Torrey, 1893, 100 Ala. 157, 172, 14 So. 685, 690, 46 Am.St.Rep. 33.

In support of the instruction given by the court in the instant case, the appellee relies upon Robinson v. Duvall, 1906, 27 App.D.C. 535, affirmed, 1907, 207 U.S. 583, 28 S.Ct. 260, 52 L.Ed. 351, and cases therein cited: The Berry Will Case, 1901, 93 Md. 560, 49 A. 401; Brooke v. Townshend, 1848, 7 Gill 10; Williams v. Lee, 1877, 47 Md. 321.

In Robinson v. Duvall it was held that the trial court had not erred in refusing a prayer of a caveator which stated that the opinion of a subscribing witness to a will is of no more weight than the testimony of an equally credible and intelligent witness, and in granting a caveatee's prayer which stated that the testimony of a subscribing witness, other things being equal, is entitled to more weight than that of a witness who is not present at the execution of a will. This court said:

"The testimony of these two different classes of witnesses on the subject of mental capacity is not precisely on the same footing as to value. The attesting witnesses are considered in the law as placed round the testator to protect him against fraud in the execution of his will and to judge of his capacity, and it is their duty to inform themselves of his capacity before they attest his will, and therefore these witnesses are permitted to testify as to the opinion they formed of the testator's capacity at the very time he was executing his will. The mere naked opinion of other persons not occupying the positions of medical men are inadmissible in reference to the mental capacity of the testator whose will may be controverted. Some such witnesses may have such knowledge as may make their opinions of testamentary capacity admissible, but such witnesses lack the opportunity given to the subscribing witnesses to form an opinion of the testator's capacity at the moment

when he executed his will. [Citing authorities] . . ." [27 App.D.C. at pages 546, 547]

This case does no more than recognize that because attesting witnesses are present at the time of the execution of the will and have a duty to judge of capacity, their testimony may be of greater value than that of those who have no opportunity to observe and no duty.

In the Berry Will Case, *supra,* the trial court had instructed the jury that the opinions of subscribing witnesses were of no more weight than the opinions of other witnesses of equal intelligence and of equal knowledge of the matters as to which the subscribing and non-subscribing witnesses testified. In holding this instruction erroneous the Court of Appeals of Maryland said:

"This places the testimony of these two classes of witnesses on the subject of mental capacity upon precisely the same footing as to value, provided the non-subscribing witnesses were equally as intelligent as the subscribing witnesses and possessed equal knowledge of the matters as to which each class had respectively testified. The proposition thus announced is manifestly misleading. It entirely eliminates all consideration of the *credibility* of the witnesses, and thus authorizes the jury to attach as much value to the testimony of a witness who deserves no credit as to the testimony of one thoroughly reliable, if both are, though not equally credible, equally *intelligent* and possessed of equal knowledge of the facts to which both testify. Again: It altogether loses sight of the distinction which the law makes between subscribing and non-subscribing witnesses. In the case of Townshend v. Townshend, 7 Gill [10] 27, this difference is distinctly pointed out. . . ." [93 Md. at page 594, 49 A. at page 413]

In Brooke v. Townshend, *supra,*[1] the issue was whether a non-expert witness could give his opinion as to sanity. In ruling in the negative the Court of Appeals of Maryland said:

"It is stated by the elementary writers upon this subject, that the attesting witnesses are considered in the law as placed round the testator, to protect him against fraud in the execution of his will, *and to judge of his capacity* . . . and it is their duty to inform themselves of his capacity, before they attest his will, and it is on this ground, that these witnesses are permitted to testify as to the opinions they formed of the testator's capacity, at the time of executing his will. And it is equally true, as a general proposition, that the mere naked opinions of other persons, not occupying the position of medical men, are inadmissible in reference to the mental capacity of a testator, whose will may be controverted." [Italics supplied] [7 Gill at page 27]

In Williams v. Lee, *supra,* in reviewing the testimony bearing upon the competency of a testatrix the court said:

"There were three subscribing witnesses to each paper, and of these but two, Mr. Wiles, a witness to the will and afterwards a Judge of the Orphans' Court, and Judge Price, a witness to the codicil, survive and have testified in the case. Each of them without hesitation and with emphasis swears that on the respective dates of these papers she was, in his opinion, incompetent to execute a will. Their testimony is important and entitled to great weight. As attesting witnesses they were entitled to give their opinions unaccompanied by any statement of facts or circumstances upon which they were founded. . . ." [47 Md. at page 325]

We find nothing in any of these cases lending support to the view that a jury must arbitrarily give greater weight to the testimony of attesting witnesses than to that of others who may, in the circumstances of a particular case, have been better informed as to the mental capacity of the maker of the will.

### III.

On the subject of the standard of mental competency required by law for the making of a will the court instructed the jury in terms of the caveator's instruction No. 1 and in terms of the caveatee's prayers Nos. 4, 5 and 7, as follows:

"[Caveator's Prayer No. 1] You are instructed, as a matter of law, that testatrix, in order to be capable of executing a valid will, must possess memory and mind enough to know the property that she owns and wishes to dispose of. She must have sufficient mind and memory to comprehend generally the nature and extent of the property which constitutes her estate and to know the objects of her bounty. If

---

[1] Cited in the quotation from The Berry Will Case above as Townshend v. Townshend.

from a preponderance of the evidence you believe that Wena D. Thompson, the testatrix herein, was incapable of intelligently understanding the nature and extent of the property which constituted her estate and to recall the natural objects of her bounty, then your answer to Question No. 2 must be 'No.'"

"[Caveatee's Prayer No. 4] The jury are instructed that to make a valid will it is not necessary that the testatrix should be endowed with a high order of intellect or even an intellect measuring up to the ordinary standards of mankind. Nor is it necessary to the making of a valid will that she should have a perfect memory or that her mind should be wholly unimpaired by age, sickness, or other infirmities. If she possesses memory and mind enough to know in a general way what property she owns and desires to dispose of and the person or persons to whom she intends to give it and the manner in which she wishes it applied by such person and generally fully understands her purposes and the business she is engaged in, in so disposing of her property, and, further, if she understands and knows the natural objects of her bounty, she is, in contemplation of law, of sound and disposing mind."

"[Caveatee's Prayer No. 5] The jury are instructed that the question of the mental capacity of an aged or feeble person to dispose of her property is not whether or not the powers of her mind were impaired or whether or not she had ordinary capacity to do business, but the question is whether or not she had any, the smallest capacity to understand what she was doing and to determine intelligently whether or not she would do it. Old age, eccentricity, partial impairment of the mental faculties, delusion, or lapses of memory not affecting the immediate transaction are not sufficient basis for setting aside a will, if the testatrix possesses sufficient mental capacity to comprehend the nature of the transaction."

"[Caveatee's Prayer No. 7] The jury are instructed that Wena D. Thompson was not required by law to be able, at the moment of executing this will, to carry in her mind the details of her estate or to have had at the time actual and complete knowledge of the nature and condition of all her property or of its precise extent and value. Nor is it necessary that she should be able to specify every part of her property. All the law requires is that she

should have had a general comprehension of her estate and of the act in which she was engaged and of the effect of the will she was making. It was not necessary that she should have had ability, at the time in question, to call to mind all items of her property and to appreciate, as well as to remember, the value of each item."

The appellant urges that caveatee's Prayer No. 5, especially because of the clause therein "the *smallest capacity* to understand what she was doing and to determine intelligently whether or not she would do it" (italics supplied), is confusing when considered in connection with caveator's Prayer No. 1. We think that it is so confusing and this not only in comparison with Prayer No. 1, but also when read in connection with the other instructions above quoted. We think, moreover, that it is erroneous in its implication.

The standard of mental competency for this jurisdiction has been adequately phrased in Lewis v. American Security & Trust Co., 1923, 53 App.D.C. 258, 289 F. 916. There the correctness of the trial court's charge on the question of mental competency was one of the subjects of the appeal. We held the charge proper. The jury had been told:

"... that neither age, sickness, nor extreme debility will affect the capacity of a person to make a valid will, if he retains sufficient mind and memory to know:

"'(1) What property he owns in a general way; (2) the person or persons who would be the natural objects of his bounty and his relation towards them; and (3) the nature of the instrument he is executing; and if they believe from the evidence that Samuel E. Lewis possessed sufficient mentality to meet these requirements their verdict should sustain his will.'" [53 App. D.C. at page 261, 289 F. at page 919]

The court had also instructed the jury:

"... that if the testator 'did not have sufficient mind and memory to know in a general way the extent and nature of his property, and who were the natural objects of his bounty and their deserts, if any, with reference to their conduct toward him and their treatment of him, and what were their relative claims upon his bounty, if any, and necessities, and generally to understand the business he was engaged in when executing the paper writing in controversy in disposing of his

property,' the jury should find want of testamentary capacity." [53 App.D.C. at page 261, 289 F. at page 919]

In sustaining these instructions we said:

"Section 1625 of the Code [D.C.Code 1929, T. 29, § 21] declares that:

"'No will, testament, or codicil shall be good and effectual for any purpose whatever unless the person making the same be, * * * of sound and disposing mind and capable of executing a valid deed or contract.'

"It is apparent from this language, as was held in Barbour v. Moore, 4 App.D.C. 535, 547, that the test is whether the testator, at the time of executing the paper purporting to be his will, was capable of making a valid deed or contract. As observed in that case, the right to make a will disposing of property in accordance with one's desires, 'even to gratify partialities or prejudices,' is among the most prized privileges secured by the law. The court added:

"'To make a valid will it is not necessary that the testator should be endowed with a high order of intellect, or even an intellect measuring up to the ordinary standards of mankind. Nor is it necessary to the making of a valid will that the party should have a perfect memory, and that his mind should be wholly unimpaired by age, sickness or other infirmities. If the party possess memory and mind enough to know what property he owns and desires to dispose of, and the person or persons to whom he intends to give it, and the manner in which he wishes it applied by such person, and, generally, fully understands his purposes and the business he is engaged in, in so disposing of his property, he is, in contemplation of law, of sound and disposing mind.'

"Substantially the same test is applied in Maryland. Lyon v. Townsend, 124 Md. 163, 91 A. 704.

"It is unnecessary to examine the decisions in other jurisdictions, since we regard the rule here to be substantially embodied in the authorities already cited. However, it may be observed in passing, that in 40 Cyc. 1004, we find:

"'The rule to determine testamentary capacity is that the testator must have sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate, and which he intends to dispose of, and to recollect the objects of his bounty.'

"And in 28 R.C.L. at page 86, it is said:

"'Perhaps the shortest and almost universal rule given for determining testamentary capacity is that the testator must be able to understand the business in which he is engaged when he makes his will, and to appreciate the effect of the disposition made by him of his property.'" [53 App. D.C. at pages 260, 261, 289 F. at pages 918, 919]

That portion of the language of the court above set forth as adopted from the case of Barbour v. Moore, 1894, 4 App.D.C. 535, 547, appeal dismissed 18 S.Ct. 939, 42 L.Ed. 1211, was used by the trial court in the instant case in caveatee's Prayer No. 4, and the charge in the instant case, exclusive of caveatee's Prayer No. 5, correctly set forth the law. But we think that caveatee's Prayer No. 5 given by the court was erroneous in itself in its adoption as a standard of "the smallest capacity to understand what she was doing and to determine intelligently whether or not she would do it," and was likely when read in connection with the other instructions to mislead the jury.

Probably in giving caveatee's Prayer No. 5 and by the use of the questioned clause therein the trial court intended merely to warn the jury that the law does not deny even to the very ignorant or stupid the right to make a will, or that degrees of intelligence above the minimum standard required by the law are not material. Such a warning would be warranted. But we think that the questioned clause would probably have caused the jury to conclude, looking at this particular instruction, that the barest signs of intelligence are sufficient. The clause seems in its implications to lay down a much lower standard of intelligence than that implied in the more comprehensive language of the balance of the instructions; and the jury may well, therefore, in contrasting the two standards apparently announced by the court, have found itself in the dilemma of choosing between them and may therefore have followed the much more limited, and, we think, incorrect, one in the instruction complained of. It may be noted further that if, as above suggested, it was the intention of the court merely to warn the jury that the law does not deny even to the very ignorant or stupid the right to

make a will, the instruction was inappropriate and for that reason likely to mislead—because while there was evidence in the case from which the jury might have concluded that the decedent was of infirm memory or that she was a user of drugs which would impair her mental powers while under their influence, there was nothing in the case, as we read the record, indicating that the decedent was either a stupid or an ignorant person.

In support of Prayer No. 5, the appellee urges Gibson v. Collins, 1925, 55 App.D.C. 262, 4 F.2d 874, certiorari denied 1925, 267 U.S. 605, 45 S.Ct. 508, 69 L.Ed. 810. That was a suit by the next friend of a grantor of a deed to set the same aside on the ground of mental incapacity and undue influence and fraud. There was some evidence of senile dementia, or of impairment of mind by age. But in reviewing the evidence, the court indicated that it showed on the whole that the grantor was clearly competent to make the deed. The court also concluded that there was insufficient evidence of fraud. It then directed its attention to the subject of undue influence and to the fact that the transaction in question in the case was brought to the attention of the grantor and carried out at a time when she was bowed down with grief over the death of the son whose wife was the beneficiary of the deed. On this subject we said:

"Actions betraying gratitude for services rendered or to be rendered to an aged person under the circumstances here detailed, and the relations which had existed between the mother, her son, and daughter-in-law over a period of 25 years, do not constitute undue influence. As the court said in Mackall v. Mackall, 135 U.S. 167, 172, 10 S.Ct. 705, 707 (34 L.Ed. 84): 'It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.' And in Conley v. Nailor, 118 U.S. 127, 134, 6 S.Ct. 1001, 1005 (30 L.Ed. 112) the court in announcing the rule said: 'The undue influence for which a will or deed will be annulled must be such as, that the party making it has no free will, but stands in vinculis.' The situation disclosed in the present case falls far short of meeting the heavy burden cast upon the plaintiffs in attempting to establish the invalidity of the deed upon the theory that it was executed as the result of undue influence exerted upon the mother.

"The rule is no less stringent on the question of lack of mental capacity. As was said by Judge Sanborn in Ludwig v. Bressler, 253 F. 8, 11, 165 C.C.A. 28, 31: 'The question of the mental capacity of an aged or feeble person to dispose of her property is not whether or not the powers of her mind were impaired, or whether or not she had ordinary capacity to do business, but it is whether or not she had *any —the smallest—capacity to understand what she was doing, and to determine intelligently whether or not she would do it.* [Citing authorities] Any other test would wrest from the feeble and the aged that power over their earnings and savings which is their best safeguard against misfortune, and would produce endless uncertainty, difficulty, and litigation.' Unquestionably the infirmity of years was showing its influence upon the mother in this case, but not to an extraordinary degree; not to the extent of disabling her from determining whether or not she desired to make the conveyance at the time it was made; and not to the extent of disabling her from transacting her own affairs, in a limited way, or acting upon the advice of others.

"Old age, eccentricity, partial impairment of mental faculties, delusion or lapses of memory not affecting the immediate transaction, are not sufficient basis for setting aside a conveyance, if the grantor possesses sufficient mental capacity to comprehend the nature of the transaction. Crosby v. Dorward, 248 Ill. 471, 94 N.E. 78, 140 Am.St.Rep. 230. That the mother, in this instance, at the time the deed was executed, the moment when mental capacity must be tested, was sufficiently in possession of her faculties to comprehend the nature of the transaction, its object, and the reason for making the conveyance, we think is beyond question. In the light of the record, every principle of justice and equity impels us to uphold the validity of this conveyance." [Italics supplied] [55 App.D.C. at pages 265, 266, 4 F.2d at pages 877, 878]

No mention is made in Gibson v. Collins of Lewis v. American Security & Trust Co., *supra,* or of the standard of mental competency therein defined, and we think it apparent that it was not the intention of the court in Gibson v. Collins to an-

nounce any modification or any reduction of that standard. It will be noted also that the remarks of the court in Gibson v. Collins are in the course of a review and comment upon the evidence, and not in the course of passing upon the correctness of an instruction. Ludwig v. Bressler, which is cited in Gibson v. Collins and which is the source of the clause "the smallest capacity to understand what she was doing and to determine intelligently whether or not she would do it," was again a case in which the court used the questioned clause in the course of review of and comment upon evidence rather than in passing upon the correctness of an instruction, and was again a case in which the court found that by the preponderance of the evidence the person whose mental capacity was in issue had ample capacity to understand the effect of deeds she had made and to decide intelligently whether or not she should make them. As was said in King v. Rowan, 1903, 82 Miss. 1, 15, 34 So. 325, 327:

" . . . it is not always safe to take the language of a court *arguendo*, and use it literally in an instruction. Instructions must be suited to the facts of the particular case."

The order of the trial court is accordingly

Reversed and the case remanded for further proceedings not inconsistent with this opinion.

WHEAT, Chief Justice of the District Court (dissenting).

(1) I agree with the conclusion reached in the first portion of the foregoing opinion which holds that the executor had a right to waive the privilege of the physicians and that it was not error for the trial court to permit them to testify. From the other conclusions as set forth in the opinion, I feel compelled to dissent.

(2) The jury was instructed in substance that the testimony of the two attesting witnesses to the will "other things being equal" was entitled to more weight as to the mental condition of the testatrix at the time she executed the will than was that of witnesses who were not present at the time of the execution of the will. It is to be observed that the instruction applies only to the mental condition of the testatrix "at the time she executed the will", and should the jury be satisfied that the attesting witnesses were disinterested, intelligent and truthful. I think the instruction, as given, correctly states the law applicable to the situation and finds ample support in Robinson v. Duvall, 27 App.D. C. 535, affirmed 207 U.S. 583, 28 S.Ct. 260, 52 L.Ed. 351, and cases therein cited: The Berry Will Case, 93 Md. 560, 594, 49 A. 401; Brooke v. Townshend, 7 Gill 10, 27; Williams v. Lee, 47 Md. 321.

(3) I am unable to assent to the proposition that caveatee's prayer No. 5 is confusing when considered in connection with caveator's prayer No. 1 and certain of caveatee's prayers. I think caveatee's prayer No. 5 is a correct statement of the law, Gibson v. Collins, 55 App.D.C. 262, 4 F.2d 874, and, when read in connection with the other instructions, I am unable to believe that it could lead to any misunderstanding or confusion on the part of the jury.

I think the judgment should be affirmed.