# MORGAN *v.* ADAMS.*

TRIAL; DIRECTION OF VERDICT; EVIDENCE; WILLS; APPEALS; TESTA-
MENTARY CAPACITY.

1. It is only when, conceding the credibility of the witnesses, and giving
   effect to every legitimate inference that may be deduced from their
   testimony, the party having the burden of proof upon an issue has
   plainly not made out a case sufficient in law to entitle him to a
   verdict, that the court is justified in withdrawing the issue from the
   consideration of the jury.  (Following *Adams* v. *Washington & G. R.
   Co.* 9 App. D. C. 26, and *Barbour* v. *Moore,* 10 App. D. C. 30.)

2. If the evidence in a particular case is sufficient to warrant its submis-
   sion to the jury, and judgment has been entered upon their verdict,
   the appellate court cannot pass upon the weight of the evidence or
   upon the credibility of the witnesses, but must confine its considera-
   tion to errors of law in respect to the admission and exclusion of
   evidence and the charge.  (Following *Barbour* v. *Moore,* supra.)

3. In a proceeding to set aside a will, where there are two issues, one
   involving the question of testamentary capacity and the other undue
   influence, a verdict finding want of such capacity will support a judg-
   ment refusing probate of the will.  It will not avail the caveatee on
   appeal to show error on the other issue, but to obtain reversal, error
   must be shown in respect of both.  (Following *McDermott* v. *Severe,*
   25 App. D. C. 276.)

4. In a will case involving the question of the testamentary capacity of
   the testatrix, a woman of about eighty-two years of age, it was *held,*
   on a review of the testimony, tending to show decline in her mental

---

*Testamentary Capacity.*—In the following editorial notes, various ques-
tions involved in the issue of testamentary capacity are discussed and the
authorities presented: Effect of morphinism on testamentary capacity, note
to *Edwards* v. *State,* 39 L.R.A. 263; Presumption and burden of proof as to
testator's capacity, note to *State* v. *Scott,* 36 L.R.A. 724; Belief in spiritu-
alism, witchcraft, etc., as affecting testamentary capacity, note to *Lewis* v.
*Arbuckle,* 16 L.R.A. 677; Drunkenness as affecting testamentary capacity,
note to *Re Miller,* 39 L.R.A. 220.

and physical condition and business capacity, and increasing dependence and forgetfulness, during several years prior to the making of the will, and medical testimony indicating senile degeneracy and progressive paresis, that the trial court properly submitted such question to the jury.

5. On an application by two of the beneficiaries under a will (one of whom was the executor), who had been unsuccessful on an appeal to this court from a decree refusing probate of the will on the ground of its invalidity, for a writ of error to the Supreme Court of the United States, it appearing that the value of the estate claimed under the will was about $7,000; that the bequests to the appellants aggregated $4,200; and that the third beneficiary under the will was one of the contestants, although he had not appealed,—this court, while expressing doubt as to whether the appellants were entitled to the writ of error, granted the same.

No. 1740.    Submitted February 6, 1907.    Decided March 5, 1907.

HEARING on an appeal by the caveatees from a judgment of the Supreme Court of the District of Columbia sitting as a Probate Court, refusing to admit a will to probate after the trial of issues by jury.                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from an order denying the probate of the will of Julia M. Adams, who died in the District of Columbia on June 24, 1905.

The will was executed in proper form on February 11, 1905. After directing the payment of debts, if any, and expressing the desire to be buried in a lot in Rock Creek cemetery, which she owned jointly with her friends, Decatur and Jennie G. Morgan, the testatrix made the following bequests:

1. To Jennie G. Morgan $200, for the purpose of erecting a stone to mark testatrix's grave.

2. To Jennie G. Morgan, watch, all jewelry, clothes, personal effects, and books.

3. To Jennie G. Morgan $3,000 for her kindness and care; in event of her death before testatrix, to go to her husband Decatur Morgan.

4.` To Decatur Morgan $1,000; and, in case of his death before testatrix, to Jennie G. Morgan.

5. To Epiphany Church, of Washington, $250 for its endowment fund.

6. To·Carrie M. Adams and Frank W. Adams each $10.

7. All the rest and residue of the estate to her nephew, Charles H. Adams.

Decatur Morgan was appointed executor.

This will was offered for probate by Decatur Morgan on June 29, 1905. On August 7, 1905, Carrie M. and Charles H. Adams filed a caveat, charging that the testatrix was not of sound mind, and therefore incapable of executing a valid will on February 11, 1905; that execution of the will was procured by undue influence exercised by the said Morgans; and that its execution was procured by fraud and coercion practised by the said Morgans.

· The Morgans having answered denying the aforesaid charges, the following issues were framed in the special term holding sessions for probate business, and transmitted to another of the special terms for trial by jury:

1st. .Was the paper writing propounded as the last will and testament of Julia M. Adams, bearing date the 11th day of February, 1905, executed by her in due form of law?

2d. Was the said Julia M. Adams, at the time of executing the said paper writing, of sound and disposing mind and capable of executing a valid deed or contract?

3d. Was the execution of the said paper writing by said Julia M. Adams procured by the undue influence of said Decatur Morgan, or Jennie G. Morgan, or any other person or persons?

4th. Was the execution of the said paper writing by said Julia M. Adams procured by the fraud and coercion of the said Decatur Morgan, or Jennie G. Morgan, or any other person or persons?

By answering "yes" to the first and third issues, and "no" to the second and fourth, the jury found that the will was executed in due form; that the testatrix was not, at the time of its

execution, of sound and disposing mind and capable of executing a valid will or contract; that execution had been procured by the undue influence of the Morgans; and that execution was not procured by the fraud and coercion of the said Morgans.

From the final order entered in accordance with said verdict, the Morgans have prosecuted this appeal.

*Mr. E. Hilton Jackson* for the appellants.

*Mr. J. J. Darlington* and *Mr. S. Herbert Giesy* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Four specifications of error have been assigned by the appellants. The first three relate to the issue of undue influence. The fourth relates to that of testamentary capacity, and is that the court erred "in refusing to instruct the jury to return a verdict of 'yes' in respect to the issue as to whether testatrix was of sound and disposing mind, as set forth in caveatees' second prayer."

Inasmuch as testamentary capacity is the primary question in such cases as this, and the issue relating thereto was, as usual, the first in order of submission, we shall first consider the error assigned thereon.

The following facts appear substantially without question: Testatrix was about eighty-two years of age, on February 11, 1905, and physically weak. She came from Connecticut to Washington about forty years before her death, and obtained a position in the Treasury Department as a clerk. Because of her advanced age she was compelled to give up her position some five or six years before her death. Her entire estate, amounting to about $7,500, at the time of her decease, was the result of savings from her salary. Aside from clothing, a watch, some inexpensive ornaments, and books, the estate consisted of notes secured by liens upon real estate. Her practice had been to in-

vest her savings in loans. These investments had been made for
her for many years through B. H. Warner & Company, who
attended to collections of principal and interest, and to renewals
and reinvestments. She had a box in the safety vaults of the
Washington Loan and Trust Company, wherein she kept her
notes. She was very economical, and, after her retirement from
the public service, lived upon the interest of her investments.
Until the last year of her life she had never encroached upon.
her principal but once. Some time in 1894 she drew $1,000
which she gave to her nephew, Charles H. Adams, who lived in
Connecticut, to enable him to build a house. For this she took
his note, bearing interest, secured by a mortgage upon the prop-
erty, with the understanding that he need pay neither princi-
pal nor interest until called upon to do so. No interest had ever
been called for by her. Her relations with this nephew, who
is one of the caveators, were affectionate, and they maintained
correspondence with each other. For some years prior to her
retirement from work, and until the last year of her life, she
lodged and boarded in the Le Fetra hotel, paying therefor $35
per month. She had been a woman of bright mind and strong
will.

Some years prior to her decease, the Morgans, who had re-
cently intermarried, came to the La Fetra house to live, and
made the acquaintance of the testatrix. Mrs. Morgan and testa-
trix became intimate friends, and evinced much affection for
each other. These intimate relations continued after the Mor-
gans established homes in other parts of the city, and in May,
1902, testatrix, who had attended the funeral of an old friend
in an undertaker's establishment, and was much affected there-
by, wrote and signed instructions directing that in case of her
serious illness the Morgans were to care for her, and in the
event of her death to see to her proper burial. She frequently
spent the day in the Morgans' house, and about one year before
her death went to live with them. Mrs. Morgan testified that
testatrix said to her: "I am old and sick, and need some person
to take care of me." Testatrix had made several wills during
some years before her death, changing bequests by reason of

·deaths of beneficiaries, etc. The same attorney who had pre·
pared these wrote another for her on October 11, 1904. The
memoranda for this will were taken to the attorney by Mr. Mor-
gan. When prepared, it was executed and attested in proper
form. This will directed the payment to Mrs. Morgan of $200
for the erection of a monument, gave $1,000 each to her and
Mr. Morgan, and bequeathed the residue of her estate to the
·caveatees, two of whom were her nephews and one her niece.
Her books were also given to her nephew, Charles H. Adams.
This will was apparently destroyed after the execution of the
one in controversy, which was written by the attorney of Mr.
Morgan, who received the memoranda therefor from Morgan.
In the spring of 1904 testatrix commenced drawing very un-
usual sums of money from her investment agents. The drafts
in February, March, and April were not unusual, but increased
·in amount and frequency in May, June, and July. In June
she ordered a $500 note cashed, and drew the money. She re-
·ceived at one time $1,505.60 for another note ordered cashed.
The total amount of drafts between February 3 and December
·29, 1904, was $2,875.72. From January to June 14, 1905,
she drew $730.

The caveators introduced a considerable number of witnesses
to show incapacity on the part of the testatrix at the time of the
execution of the will. These had known her well for from twen-
ty to thirty years, and had opportunities to know her mental
condition during the time.

It would serve no useful purpose to review the testimony at
length. Some of it, by itself, was of no very great weight, as
it tended to show that testatrix had become enfeebled in body
and mind during her last ten years, but fell short of showing
total incapacity. She was described as becoming forgetful, re-
peating the same thing frequently during a short conversation,
and talking incoherently. One of these, however, who had
known testatrix intimately for many years, had visited her
and talked with her while at the Morgans. She testified that
she observed quite a decline in her mental and physical strength
·during these later years. Her momery was failing very fast

and in a marked degree. She had a weak, feeble, and almost childish expression and manner, and needed someone to care for her as if she were a child. She was very weak and feeble in February, 1905; seemed to be mentally incapacitated in every way, and perfectly dependent. She had formerly always been particular in dress and dressing her hair, but ceased to dress her hair, and dressed like an invalid unable to properly dress herself. Failure was rapid during the last year of her life. A physician who had known testatrix intimately for years, and occasionally treated her, said that her mind had been strong, but some four or five years before her death he observed indications of senile degeneracy and progressive paresis. Other testimony tended to show that some months prior to making the will she had undertaken to show her nephew the room in the Treasury where she had worked many years, but was unable to find it. There was other testimony tending to show acts of forgetfulness and change of purpose. The president of the Washington Loan & Trust Company where her notes were kept, testified to having had business for her during thirty years. He testified that he saw her in October, 1904, and was forcibly impressed by the change in her mental condition. His opinion was that she needed someone to look after her affairs. Mr. Rheem, formerly of the B. H. Warner Company, said that he had attended to her investments, collections of interest, and reinvestments for twenty years or more. That she had been a very close, saving woman, keeping her money invested, and never encroaching upon her principal save in the advance made to her nephew some ten or twelve years before her death. That after she had cashed the $500 note in June, and the one for $1,500 in July, 1904, he became suspicious of her condition; and when she sent a message to him in September to cash another note for $1,500 he declined to do so.

In the fall or winter of 1904, after another demand to cash a note, he went to see her and asked her if she really wanted the money. She said "No." Mrs. Morgan was present at the interview, and remarked: "Well, that is the way with Aunt Julia; she never knows what she wants to do from one day to

another." When asked on cross-examination why his firm paid testatrix's drafts thereafter (these were generally in sums of $50 from time to time), he said: "I consulted counsel and was advised it was my duty to withhold the principal from testatrix in case of the payment of notes; at the same time I was told to allow a liberal support, even if it were taken from the principal, unless I chose to embarrass Miss Adams by lunacy proceedings." He said his firm assumed the responsibility of a loss of the money, rather than distress Miss Adams by refusing to honor drafts for her support. Mr. Swartzell, another member of the firm, said that he went with Rheem to see testatrix November 30, 1904, and said that she did not appear in a fit condition, mentally or physically, to manage her affairs.

Testimony tended further to show that it had been the practice of the company, when interest was collected, to have her get the proper note from her safe deposit, and bring it for indorsement of the credit. During the last year of her life she had on three different occasions returned with the wrong note; and that on one occasion she had made three trips before presenting the right note.

Other testimony tended to show that Mrs. Morgan had stated on one occasion that she was hunting testatrix, who had left home to visit her broker's office, and had gotten lost. The office was but a few blocks from her home. Also that Mrs. Morgan had said that testatrix had gotten lost twice on similar trips; that once she had taken an 11th street car, and gone out to the end of the track; another time she had taken a Mount Pleasant car, and had been found at that place, which was several miles away.

The caveatees introduced a less number of witnesses than the caveators had, whose testimony tended to show that they knew testatrix well, and that, though physically weak during the last year of her life, she was mentally sound and capable of executing a valid will.

The prayer of the caveatees to direct the jury to answer "yes" to this issue was offered at the conclusion of all of the evidence. Having refused it, the court gave all of the prayers requested

by them relating to this issue. These directed the jury, substantially, that the presumption of law is in favor of the sanity and capacity of the testatrix to make a will, and that the burden of proof is upon the caveators to establish a want of testamentary capacity by a fair preponderance of testimony; that every person of twenty-one years of age is presumed of sound mind and competent to make a will, and this presumption extends through life, no matter to what age she may live; that to make a valid will, it is not necessary that the testatrix should be endowed with a high order of intellect, nor even an intellect measuring up to the ordinary standards of humanity; nor is it necessary that the testatrix should have perfect memory, and a mind wholly unimpaired by age, sickness, or other infirmities; if she possesses memory and mind enough to know what property she owns and desires to dispose of, and the person to whom she intends to give it, and the manner in which she wishes it applied by such person and, generally, fully understands her purposes and the business she is engaged in, in so disposing of her property, she is, in contemplation of law, of sound and disposing mind; and neither age, nor sickness, nor extreme distress will affect the capacity to make a will if sufficient intelligence is present; that the jury are not authorized to pass upon the reasonableness of the provisions of the will; nor would they be justified in finding against it because they thought its provisions unreasonable or not in accord with their ideas of what is right or what the disposition should have been.

After a careful examination of the testimony, we are of the opinion that the court did not err in refusing the appellants' prayer to direct a verdict.

It is the province of the jury to determine the credibility of the witnesses and the weight to be given to their testimony, under proper instructions for their guidance, which, as we have seen, were given as requested by the appellants. It is only when, conceding the credibility of the witnesses, and giving effect to every legitimate inference that may be deduced from their testimony, the party having the burden of proof upon an issue has plainly not made out a case sufficient in law to entitle him

to a verdict, that the court is justified in withdrawing the issue from the consideration of the jury. *Adams* v. *Washington & G. R. Co.* 9 App. D. C. 26, 31, and cases there cited. See also a case wherein the issue was of the testamentary capacity. *Barbour* v. *Moore,* 10 App. D. C. 30, 48.

Another way of stating the rule in such cases is this: If fairminded men might honestly draw different conclusions from the evidence, the fact must be determined by the jury under proper instructions as to the law applicable thereto. *McDermott* v. *Severe,* 202 U. S. 600, 604, 50 L. ed. 1162, 1165, 26 Sup. Ct. Rep. 709, and cases cited. See also *Mosheuvel* v. *District of Columbia,* 191 U. S. 247, 252, 48 L. ed. 170, 172, 24 Sup. Ct. Rep. 57, 17 App. D. C. 401.

We have not recited the testimony offered on behalf of the caveatees to rebut the case made by the caveators, and have rested our conclusion on the sufficiency of the latter, because it is not within the province of an appellate court to pass upon the weight to be given the evidence as a whole, any more than upon the credibility of the several witnesses. If the evidence be regarded as sufficient, under the requirements of the law in a particular case, to warrant its submission to the jury, and their verdict has been approved and carried into judgment by the trial court, the consideration of the appellate court is confined to errors of law in respect of the admission and exclusion of evidence, and the charge. *Ætna L. Ins. Co.* v. *Ward,* 140 U. S. 76, 91, 35 L. ed. 371, 376, 11 Sup. Ct. Rep. 720; *Barbour* v. *Moore,* 10 App. D. C. 30, 50.

The conclusion at which we have arrived renders it unnecessary to consider the errors assigned in respect of the issue of undue influence. The verdict on the issue of testamentary capacity being sufficient to support the judgment, it would not avail appellants if error could be shown on the other. To obtain reversal, error would have to be shown in respect of both. *McDermott* v. *Severe,* 25 App. D. C. 276, 282, 202 U. S. 600, 603, 50 L. ed. 1162, 1165, 26 Sup. Ct. Rep. 709.

There was no necessary connection between the determination of the two issues; and it is not perceived how error in respect

of one could have prejudiced the appellants in the trial of the other. In view of the verdict upon the first issue, a finding in their favor upon the second would be of no avail. *Glenn* v. *Sumner,* 132 U. S. 152, 157, 33 L. ed. 301, 10 Sup. Ct. Rep. 41; *West* v. *Camden,* 135 U. S. 507, 521, 34 L. ed. 254, 258, 10 Sup. Ct. Rep. 838.

Finding no error for which the verdict on the first issue could be set aside and a new trial thereof ordered, the judgment must be affirmed with costs.                              *Affirmed.*

The appellants, on March 12, 1907, applied for a writ of error to the Supreme Court of the United States, and on March 14, 1907, the writ was allowed, Mr. Chief Justice Shepard delivering the opinion of the Court:

The appellants have applied for a writ of error to review this judgment in the Supreme Court of the United States.

The value of the estate claimed under the will offered for probate is about $7,000. The bequests to the two appellants combined amount to $4,200, and the remainder of the estate, after three small legacies, is bequeathed to Charles H. Adams. However, the latter, whose interest under the will is apparently greater than that which he will receive as one of the three next of kin in case of intestacy, is one of the contestants of the will. Decatur Morgan, one of the appellants, is the .executor named in the will and charged with its execution. We entertain some doubt whether the appellants are entitled to the writ of error under the decisions on which they rely. *Overby* v. *Gordon,* 177 U. S. 214, 218, 44 L. ed. 741, 743, 20 Sup. Ct. Rep. 603; *Shields* v. *Thomas,* 17 How. 3, 15 L. ed. 93; *New Orleans P. R. Co.* v. *Parker,* 143 U. S. 42, 51, 36 L. ed. 66, 68, 12 Sup. Ct. Rep. 364. Following our rule in cases of doubt, the writ of error is *allowed; and the bond therefor, without supersedeas, is fixed at* $300.