*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-PR-630

EMMA M. GOVAN, APPELLANT,

v.

JULIE EBNER BROWN, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(LIT-12-14)

(Hon. Gerald I. Fisher, Trial Judge)

(Argued April 17, 2019                              Decided May 28, 2020)

*Johnny M. Howard* for appellant.

*Christopher G. Hoge*, with whom *Elena Iuga* was on the brief, for appellee Julie Ebner Brown.

*Robert E. Grant* and *James P. Lillis* filed a statement in lieu of brief for appellee Holy Comforter St. Cyprian Roman Catholic School.

Before BLACKBURNE-RIGSBY, *Chief Judge*, MCLEESE, *Associate Judge*, and STEADMAN, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*:  After an evidentiary hearing, Judge Gerald Fisher denied appellant Emma M. Govan's request to admit and enforce a contested will executed by Emil Ebner on October 24, 2013 (the "2013 will").  The

trial court ruled that the 2013 will was invalid because Mr. Ebner lacked testamentary capacity, specifically finding that Mr. Ebner "would not have been able to understand the terms of the document without explanation to him, and no such evidence was presented." We disagree, and we use this opportunity to clarify the standard for testamentary capacity.

A presumption exists in favor of testamentary capacity. *See Morgan v. Adams*, 29 App. D.C. 198, 206 (D.C. Cir. 1907). However, a party may challenge that presumption and invalidate a will by proving a lack of testamentary capacity. *See Brosnan v. Brosnan*, 263 U.S. 345, 349-50 (1923). To prove a lack of testamentary capacity, a party must show, by a preponderance of the evidence, that a testator did not have sufficient memory and mind at the time of executing a will to generally know (1) the property owned, (2) the intended beneficiaries of that property, and (3) the nature of the instrument being executed. *See Thompson v. Smith*, 103 F.2d 936, 943-44 (D.C. Cir. 1939). As we explain in this opinion, the presumption in favor of testamentary capacity is not rebutted merely by the absence of evidence that a testator understood the particular testamentary document at issue.

We conclude that appellee Julie Ebner Brown failed to present evidence sufficient to rebut Mr. Ebner's testamentary capacity, which is presumed.[1] Accordingly, we reverse the decision of the trial court, vacate its order denying appellant's request to admit the 2013 will to probate, and remand for further proceedings consistent with this opinion.

## I.    Factual and Procedural Background

Mr. Ebner passed away on December 27, 2013, at ninety-three years old, leading to a dispute over which testamentary document, distributing his three homes and significant wealth, the court should enter into probate. Appellant Emma M. Govan, Mr. Ebner's neighbor, filed a complaint seeking to enforce a 2013 will, while appellee Julie Ebner Brown, Mr. Ebner's niece and appointed personal representative, sought to enforce a will he executed on August 7, 2002, which was subsequently amended by two codicils. The 2013 will deviated in two significant respects from the previous testamentary documents. First, it replaced appellee Holy Comforter St. Cyprian Roman Catholic School with Ms. Govan as the residual

---

[1] We find no merit to appellant's remaining contentions that the trial court erred in considering certain evidence regarding Mr. Ebner's capacity, as well as its admission of the expert testimony of Dr. Robert Goldstein. We address these issues below.

legatee.[2]  Second, it shifted the burden to pay estate taxes onto the beneficiaries, where the August 2002 will and codicils had allocated specific funds to pay those costs.

The trial court heard testimony concerning Mr. Ebner's life that bore on his mental capacity and the events leading up to, during, and following the preparation and execution of the 2013 will.  According to the testimony, which the trial court credited, Mr. Ebner accumulated significant wealth throughout his life, including three homes located in the District of Columbia.[3]  Although Mr. Ebner was able to live alone during the last decades of his life, he had issues that made it difficult for him to be completely independent.  He had a sixth-grade education and intellectual challenges caused by a childhood trauma.  Additionally, he had some physical limitations and vision problems.  Throughout his life, Mr. Ebner received assistance from family members, including his nieces, appellee Ms. Brown and Lisa Winters.  In 2000, Mr. Ebner executed a very broad power of attorney for Ms. Brown.  From 2000 onward, both Ms. Govan and Ms. Brown assisted Mr. Ebner, including in

---

[2]  Appellee Holy Comforter St. Cyprian Roman Catholic School, though named as a party, did not participate either before the trial court or this appeal.

[3]  Mr. Ebner began working as a paper boy, and he ended his career doing book binding work.  It appears that he inherited much of his wealth and properties, and his wealth increased through investments made by family.

business affairs and financial matters. In 2008, Mr. Ebner executed a second power of attorney for health care for Ms. Brown, which also designated Ms. Govan as the alternate.

Ms. Brown testified that Mr. Ebner had difficulty understanding issues, specifically complex matters, oftentimes needing things explained in more than one way. For example, with respect to banking, while Mr. Ebner could deposit money and write checks, he did not understand how to set up a bank account. Ms. Brown testified that when Mr. Ebner signed a deed in 2010 to transfer ownership of one his properties, he became upset because he was unsure whether to sign the document. To calm him down and alleviate his concerns, Ms. Brown read the deed to him "line by line," stopping repeatedly to make sure he understood. At that time, Mr. Ebner could not see well enough to read. Ms. Brown testified that she believed Mr. Ebner was confused and had difficulty understanding things throughout 2013 and until his passing in December of that year.

Michael Davidson, Mr. Ebner's long-time attorney, met with Mr. Ebner in January 2013 to go over Mr. Ebner's testamentary affairs and specifically to address the payment of estate taxes as contemplated in the August 2002 will and its codicils. Mr. Davidson followed up with Mr. Ebner in February 2013, at which time Mr.

Ebner stated that he did not intend to make any changes. Mr. Davidson testified that, during both conversations, Mr. Ebner "clearly understood" the nature of the conversation.

Ms. Brown testified to conversations that she had with Mr. Ebner in March, May, and October 2013 during which Mr. Ebner discussed his finances and intent on allocating his property upon his passing. Ms. Brown testified that Mr. Ebner told her in March 2013 that he wanted Ms. Brown, Ms. Winter, and another niece each to receive equal portions of his money.

Renee Williams worked as an in-home nurse's aide for Mr. Ebner approximately three days per week in 2013. She testified that, in August 2013, Mr. Ebner had no difficulty recalling events, could articulate the previous day's affairs, communicated how he felt, and was not confused. Dr. Mohammed Khan, Mr. Ebner's primary care doctor from January 2012 through his passing, managed Mr. Ebner's diabetes and chronic renal insufficiency and observed him during visits in April 2013, September 2013, and November 2013. Dr. Khan testified that, during those visits, Mr. Ebner was well oriented to time and place and did not appear to be confused.

In September 2013, Ms. Govan took Mr. Ebner to meet with a different attorney, Johnny M. Howard, regarding his testamentary affairs. Ms. Govan was present for this meeting, along with Ms. Williams. Ms. Govan testified that Mr. Ebner appeared "very alert" during this meeting, did not appear to be confused, and talked with Mr. Howard and asked questions.

A few days prior to Mr. Ebner's birthday on October 8, 2013, Ms. Brown arrived unannounced at Mr. Ebner's home with many members of Mr. Ebner's extended family for a surprise party. During the party, Mr. Ebner was disheveled, lost focus, appeared confused, did not recognize one family member whom he had not seen in many years, stared off into space, and only responded to simple questions.[4]

On October 17, 2013, Mr. Howard sent Mr. Ebner a draft will, two draft transfer-on-death deeds (which, upon Mr. Ebner's death, would have changed ownership of two properties from Ms. Brown to Ms. Govan), and a draft revocation of Ms. Brown's 2000 power of attorney. Mr. Howard included among these papers an explanation sheet for the transfer-on-death deeds.

---

[4] Ms. Brown introduced into evidence a photograph from the October 2013 surprise party that depicted Mr. Ebner.

Mr. Ebner met again with Mr. Howard on October 24, 2013, at which time he executed the 2013 will and the two transfer-on-death deeds. He did not execute the revocation of Ms. Brown's power of attorney. Ms. Govan, who attended the meeting, testified that Mr. Ebner was "jolly" and talkative during the commute to and from Mr. Howard's office, appeared alert about the matters discussed during the meeting, and did not appear to be confused. Vonda Burns and Vivian Gatling, employees of law firms in the suite where Mr. Howard worked, testified that they observed Mr. Ebner execute the will and also served as witnesses. Ms. Gatling testified that it was Mr. Howard's practice to read through every page of a will to his client, though she did not clarify whether Mr. Howard did so with Mr. Ebner.

In December 2013, Mr. Ebner required hospitalization and surgery. Ms. Govan and Ms. Brown both testified that, while he was in the hospital, they spoke with Mr. Ebner regarding his financial matters. During one such conversation, Ms. Brown testified that Mr. Ebner repeated his intention that his three nieces receive equal portions of his money after he passed. Ms. Winters testified that Mr. Ebner informed her during a telephone call in either November or December 2013 that he wanted Ms. Govan to receive $100,000 and that he had created bank accounts in Ms. Winters and Ms. Brown's names. Mr. Ebner died on December 27, 2013.

On December 30, 2013, Mr. Howard filed the 2013 will with the Probate Division of the Superior Court of the District of Columbia. On February 21, 2014, Ms. Brown filed a petition for probate seeking to admit the August 2002 will and its codicils. On April 7, 2014, Ms. Govan filed a complaint seeking to set aside the August 2002 will and codicils and to enter the 2013 will into probate.

At the hearing, Ms. Brown presented the expert testimony of Dr. Robert Goldstein, a physician who practiced internal medicine with a specialty in nephrology. Dr. Goldstein was also the parent of an attorney at the firm representing Ms. Brown. Over appellant's objection, Dr. Goldstein testified that Mr. Ebner lacked capacity when executing the 2013 will. In forming his opinion, Dr. Goldstein relied on Mr. Ebner's medical records, the deposition transcripts of Ms. Brown and Ms. Govan, conversations with Ms. Brown and Ms. Winters, and his fifty years of medical experience. He testified that, by 2013, Mr. Ebner's kidney disease, diabetes, and visual impairment would have caused confusion, fatigue, and an inability to focus. Dr. Goldstein opined that the cumulative impact of Mr. Ebner's conditions likely meant that he would not have understood or comprehended the contents of the 2013 will, even if the document had been read to him.

At the conclusion of the testimony, the trial judge found that the 2013 will was properly executed pursuant to D.C. Code § 18-103 (2012 Repl.) because it was in writing, signed by the testator, and attested to and ascribed in Mr. Ebner's presence by Ms. Burns and Ms. Gatling, two credible witnesses over the age of eighteen. However, the trial judge found that clear and convincing evidence demonstrated that Mr. Ebner lacked testamentary capacity to execute the 2013 will "because he did not understand its terms." Specifically, he found no evidence that Mr. Ebner read the will or that it was read to him or reviewed with him on the date of execution.

The trial court credited the testimony of Ms. Govan, Ms. Williams, and Dr. Khan that, at or around the time Mr. Ebner executed the 2013 will, he did not have mental difficulty making decisions and was oriented to time and place. The trial court, however, also gave "significant weight" to the testimony of Ms. Brown and Ms. Winters, who both felt that Mr. Ebner could not, on his own, understand complex matters. The trial court noted that Ms. Brown began having concerns about Mr. Ebner months in advance of October 24, 2013, similar to the concerns she had during his October 2013 surprise birthday party. Importantly, the trial court credited Ms. Brown's testimony that, in executing a deed in 2010, she had to go "over it line-by-line with him" to understand it. The trial judge gave little weight to the expert

opinion of Dr. Goldstein because his opinion stemmed from generalities and because he never examined Mr. Ebner or spoke with Dr. Kahn. Additionally, the trial court noted "legitimate issues" about Dr. Goldstein's bias due to his relationship with Ms. Brown's counsel.

Based on this testimony, the trial court determined that Mr. Ebner was "capable of understanding the terms of the October 24th will, but only if someone took the time to carefully review the document with him and explain its terms, literally going line-by-line with him through it." Because the evidence did not support this finding, the trial court found that Mr. Ebner lacked testamentary capacity when he executed the 2013 will, and therefore denied Ms. Govan's request to admit it to probate. Instead, the trial court admitted the August 2002 will and its two codicils to probate and ordered relief consistent with that finding.[5] This appeal followed.

---

[5] The trial court also found (1) insufficient evidence that Ms. Govan or Mr. Howard unduly influenced Mr. Ebner, (2) the two transfer-on-death deeds signed by Mr. Ebner at the October 24, 2013, meeting were valid, (3) no evidence of self-dealing by Ms. Brown as the personal representative, and (4) Ms. Brown was entitled to expenses and disbursements from Mr. Ebner's estate related to the litigation, pursuant to D.C. Code § 20-752 (2012 Repl.). These findings – including the trial court's further relief consistent with its order – are not before us on appeal, though they may be affected by our disposition here.

## II.    Standard of Review

In reviewing a trial court's ruling following a bench trial or evidentiary hearing, we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *Ross v. Blackwell*, 146 A.3d 385, 387 (D.C. 2016) (quoting D.C. Code § 17-305(a) (2012 Repl.)).  We review the evidence in the light most favorable to the prevailing party, and we defer to the trial court's credibility determinations unless clearly erroneous.  *Id.*  We review legal issues de novo.  *See In re Ingersoll Tr.*, 950 A.2d 672, 692 (D.C. 2008).  The issue of testamentary capacity – like those of other challenges to a will's validity, such as undue influence – is a mixed question of law and fact.  *Id.*; *Dougherty v. Rubenstein*, 914 A.2d 184, 192 (Md. Ct. Spec. App. 2007) ("The standard[] or test of testamentary capacity is a matter of law while the question of whether the evidence in the case measures up to that standard is a matter of fact." (cleaned up)).[6]

---

[6]  We find Maryland law to be persuasive because the District's statutory construction of capacity "was adopted from the Maryland Probate Act of 1798." *Rossi v. Fletcher*, 418 F.2d 1169, 1170 (D.C. Cir. 1969); *see also Phelps v. Goldberg*, 313 A.2d 683, 684 (Md. 1974) ("It appears that District of Columbia law and Maryland law on the subject of testamentary capacity are virtually identical, if not identical.").

The burden of proof regarding whether the testator, at the time of executing the will, lacked testamentary capacity is on the party challenging the mental capacity of the decedent, *see Brosnan*, 263 U.S. at 349-50, who must do so by a preponderance of the evidence, *see Thomas v. Young*, 22 F.2d 588, 590 (D.C. 1927); *Morgan*, 29 App. D.C. at 206; *see also* 3 William J. Bowe & Douglas H. Parker, Page on the Law of Wills, § 29.35 (3d ed. 2004) ("To sustain the burden of proof" of testamentary capacity, "a preponderance of the evidence is necessary."); *cf. Butler v. Harrison*, 578 A.2d 1098, 1100 (D.C. 1990) (affirming preponderance of the evidence standard in holding that appellant failed to meet burden of proof to show lack of mental capacity in executing a deed).

## III.    Legal Framework

We start with – and reaffirm – the basic presumption that all individuals have sufficient testamentary capacity to make a will, a presumption that extends throughout their life. *See Brosnan*, 263 U.S. at 349 (noting the "effective weight" given "to the presumption of the testator's sanity"); *Morgan*, 29 App. D.C. at 206 ("[T]he presumption of law is in favor of the sanity and capacity of the testatrix to make a will . . . ."); *see also Zook v. Pesce*, 91 A.3d 1114, 1122 (Md. 2014) ("The law presumes that every man is sane and has capacity to make a valid will.") (quoting

*Arbogast v. MacMillan*, 158 A.2d 97, 101 (Md. 1960)).[7] That presumption can be challenged, however, and the burden to prove a lack of testamentary capacity lies with the party challenging mental capacity. *See Brosnan*, 263 U.S. at 349; *Morgan*, 29 App. D.C. at 206; *see also Zook*, 91 A.3d at 1122 ("[T]he burden of proving the contrary rests upon those who allege that he lacked mental capacity."); *cf. Butler*, 578 A.2d at 1100-01 (noting that "the burden of proof is on the party asserting incompetency" when challenging a person's capacity to contract). The District's statute is predicated on this presumption, in that a will is not valid unless a testator is "of sound and disposing mind" at the time of executing or acknowledging it. D.C. Code § 18-102. Here we clarify the criteria that define the presumption of testamentary capacity.

Testamentary capacity is the mental state that a person must possess at the time of making a will for it to be valid, and we reaffirm that the threshold for testamentary capacity is low. *See Lewis v. Am. Sec. & Tr. Co.*, 289 F. 916, 919 (D.C. Cir. 1923). To be of "sound and disposing mind" and thereby have testamentary capacity, a testator must have sufficient memory and mind to generally know (1) the property owned, (2) the intended beneficiaries of that property, and (3) the nature of

---

[7] D.C. law requires that a person making a will be at least eighteen years old. *See* D.C. Code § 18-102 (2012 Repl.).

the instrument being executed. *See Thompson*, 103 F.2d at 943 (quoting *Lewis*, 289 F. at 919); *Barbour v. Moore*, 4 App. D.C. 535, 547 (D.C. 1894) (finding a testator to be "of sound and disposing mind" if he "possess[es] memory and mind enough to know what property he owns and desires to dispose of, and the person or persons to whom he intends to give it, and the manner in which he wishes it applied by such person, and, generally, fully understands his purposes and the business he is engaged in, in so disposing of his property"). While this court has not yet clarified the standard for testamentary capacity, the standard as articulated by our predecessor courts comports with the "standard . . . agreed upon, in substance, by the great weight of authority." 1 William J. Bowe & Douglas H. Parker, Page on the Law of Wills, § 12.21 (2d. 2003) ("Testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them."). A testator need not be "endowed with a high order of intellect, nor even an intellect measuring up to the ordinary standards of humanity; nor . . . [a] perfect memory, and a mind wholly unimpaired by age, sickness, or other infirmities." *Morgan*, 29 App. D.C. at 206. Even the weak, aged,

powerless, ignorant, and uninformed have the right to create a testamentary document. *See Thompson*, 103 F.2d at 944-45.[8]

Testamentary capacity is tested at the time a testator executes a will. *Barbour*, 4 App. D.C. at 547. In determining such capacity, the trial court may consider evidence of the testator's state of mind before, at the time of, and after the will is executed. *See id.* at 548. This includes evidence of any factor that may otherwise bear on mental capacity, such as age, impairment of mental faculties, memory loss, illness, physical condition, sedation, or other use of drugs or medication. *See Thompson*, 103 F.2d at 945; *McCartney v. Holmquist*, 106 F.2d 855, 856 (D.C. Cir. 1939). Evidence of any one or more of these factors alone, however, does not rebut the presumption of testamentary capacity when there is no indication that, at the time the testator executed a will, such factor impaired the testator or his or her understanding of the predicate knowledge of testamentary capacity. *See Thompson*, 103 F.2d at 945.

---

[8] *See also Rossi*, 418 F.2d at 1171 (affirming that persons subject to conservatorship may have testamentary capacity to make a will); D.C. Code § 21-2002(d) (2012 Repl. & 2019 Supp.) (As applied to guardianship and protective proceedings, "[a]n individual shall be presumed competent and to have the capacity to make legal, health-care, and all other decisions," unless determined otherwise).

Moreover, testamentary capacity is not defined by the testator's understanding of the testamentary document. In fact, our determination of testamentary capacity has never turned on the complexity of the document at issue, the difficulty of its terms, or the testator's understanding of it. "The standard of testamentary capacity does not mean that [the] testator must be able to understand the meaning of all the technical legal terms which are employed by counsel in drafting [the] testator's will, under his general instructions." 1 Bowe & Parker, *supra*, § 12.21. We believe it to be too high a burden to require that a testator be able to fully comprehend the document he or she signs. *Id.* Such a requirement would conflict with our standard for testamentary capacity, which only requires that a testator "generally" understand the nature of the instrument being executed. *See Thompson*, 103 F.2d at 943; *Barbour*, 4 App. D.C. at 547 (requiring only that a testator "generally, fully understands his purposes and the business he is engaged in, in so disposing of his property"); *see also In re Weir's Estate*, 475 F.2d 988, 991-92 (D.C. Cir. 1973) (noting that standard for testamentary capacity is whether the testator understood "precisely what he was doing when he executed the contested will"); 1 Bowe & Parker, *supra*, § 12.21 ("It is sufficient if [the] testator understands the legal effect

and intent of the instrument as a whole, and if the instrument is so drawn as to express [the] testator's intent.").[9]

---

[9] We are careful to distinguish between testamentary capacity, as explained here, and testamentary intent. Generally, "a will may not be admitted to probate where a purported testator is entirely ignorant of the contents of his will, indicating a lack of testamentary intent." *In re Estate of Turpin*, 19 A.3d 801, 806 (D.C. 2011). But "[t]here is a presumption that a testator knows the contents of a properly executed will." *Mann v. Cornish*, 185 F.2d 423, 424 n.4 (D.C. Cir. 1950) (citing *Lipphard v. Humphrey*, 209 U.S. 264-268-69 (1908)); *see also Wood v. Martin*, 641 A.2d 853, 854 (D.C. 1994) (noting that a properly signed and executed will gives "rise to the presumption that [a] testator knew the contents of the will regardless of his inability to read"). The presumption in favor of testamentary intent "must prevail," although it may be rebutted if there is "proof of fraud, undue influence, or want of testamentary capacity attending the execution of the will." *Lipphard*, 209 U.S. at 269.

Therein lies the intersection between intent and capacity: a want of testamentary capacity can rebut the presumption of testamentary intent that arises when a will is properly executed. However, a testator's knowledge of the contents of a will, while a predicate for testamentary intent, is not dispositive of the separate issue of testamentary capacity. Therefore, we reject appellee Brown's request that we "take guidance" from *Crafton v. Harris*, 9 Tenn. App. 561 (Ct. App. 1929), because that case turned on "the determinative question" of "whether the testator understood the legal effect of the provisions of said will," i.e., had the requisite testamentary intent, *id.* at 562 (and where the court summarily rejected the challenge to testamentary capacity, *id.* at 563). While a testator's knowledge of the contents of a will is "an essential ingredient of intent," *Turpin*, 19 A.3d at 807 (quoting 1 Bowe & Parker § 5.8), it is ultimately not necessary evidence to prove testamentary capacity.

In this case, we are not tasked with determining the question of Mr. Ebner's testamentary intent, as that issue was not raised by the trial court, argued by the parties, or addressed on appeal. *See Thornton v. Northwest Bank of Minn.*, 860 A.2d 838, 842 (D.C. 2004) ("It is fundamental that arguments not raised in the trial court are not usually considered on appeal. This court will deviate from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record." (cleaned up)).

While the complexity of a testator's property may be relevant to testamentary capacity inasmuch as capacity requires that a testator know his or her property, the legal document purporting to devise such property – and the complexity of such document – is not dispositive of the issue.  Indeed, we employ lawyers, scriveners, and other professionals to draft complicated documents that devise and divide property upon death without requiring that a testator understand the complexities of the document itself.  *Cf. Conrades v. Heller*, 87 A. 28, 32 (Md. 1913) (noting that "many wills would be invalid" if it was required that the testator understand the meaning of all the technical terms used therein, "especially those involving intricate trusts, which oftentimes dispose of large estates in terms which give judges and attorneys trouble in determining their meaning and legal effect").  Of course, evidence demonstrating that the testator read his or her will (or had it read to him or her) and understood its terms may have strong evidentiary value as to affirmative proof of capacity.  But the lack of such evidence is not a necessary criterion – nor a definitive one – to rebut the presumption in favor of it.

In sum, we reaffirm the presumption in favor of testamentary capacity, a low threshold of mental capacity.  When a party attempts to rebut that presumption by challenging the testator's mental capacity in order to invalidate a will, that party must show, by a preponderance of the evidence, that the testator did not have

sufficient memory or mind to generally know (1) the property he or she owns, (2) the persons to whom he or she intends to give it, and (3) the nature of the instrument being executed, e.g., a will. An understanding of the resulting testamentary document – including its complex legal jargon – is not dispositive to a court's analysis of whether a testator is "of sound and disposing mind."

## IV.    Analysis

We cannot reconcile the trial court's ruling with the above-clarified standard for testamentary capacity. Although the trial court determined that the 2013 will was properly executed, it found that appellee proved by clear and convincing evidence that Mr. Ebner lacked testamentary capacity because he did not understand the terms of the document, reasoning that he neither read the will prior to signing it nor had it read to him.

At the outset, it was not necessary that Ms. Brown demonstrate lack of testamentary capacity "by clear and convincing evidence," in that the burden of proof is only by a preponderance of the evidence. *See, e.g.*, *Thomas*, 22 F.2d at 590. Rather, invalidating a will on the issue of testamentary capacity merely requires showing that Mr. Ebner – at the time he executed the 2013 will – did not generally

understand the property he owned, to whom he wanted to give it, and the nature of the instrument he signed.

The evidence credited by the trial court requires a finding that Mr. Ebner had testamentary capacity. Mr. Howard, Ms. Govan, Ms. Burns, and Ms. Gatlin were all in the room when Mr. Ebner executed the 2013 will. Ms. Govan testified that Mr. Ebner was "jolly" and talkative during the commute to meet with Mr. Howard on October 24, 2013, appeared alert during the discussion with Mr. Howard, and did not appear to be confused. Ms. Brown presented no contradictory evidence concerning Mr. Ebner's mental state at that meeting. The trial court credited testimony from Ms. Govan, Ms. Williams, and Dr. Khan that, at and around the time he executed the 2013 will, Mr. Ebner did not have any mental difficulty and was oriented to time and place. The trial judge also noted that Mr. Davidson, Mr. Ebner's former attorney, believed that, during meetings in January and February 2013, "Mr. Ebner understood exactly what was going on, that he was making knowledgeable, intelligent decisions," particularly concerning payment of estate taxes. This evidence requires a finding, and does not rebut the presumption, in favor of testamentary capacity.

Moreover, the evidence demonstrates that Mr. Ebner knew his property and to whom he wanted to devise it. Both Ms. Brown and Ms. Winters testified to conversations they had with Mr. Ebner throughout 2013, even in the weeks prior to his passing in December 2013, during which Mr. Ebner discussed his property, specifically money in bank accounts, and how he wanted it allocated, to Ms. Brown, Ms. Winters, and Ms. Govan, among others. Additionally, during the October 2013 meeting with Mr. Howard, Mr. Ebner signed transfer-on-death deeds, which devised his property upon his passing. The evidence demonstrates that Mr. Ebner understood his property – to include money and real property – and understood who the intended beneficiaries of that property should be.

While the trial court gave "significant weight" to the testimony of Ms. Brown and Ms. Winters that Mr. Ebner could not, on his own, understand complex matters, we are not persuaded that this evidence rebuts the presumption in favor of testamentary capacity, or any of the predicate facts. Many business people, and people more advanced in years, receive significant assistance from others, including family members, in handling their affairs. It appears that Mr. Ebner was no different. Evidence that Mr. Ebner had difficulty handling his affairs on his own, particularly financial and business matters, does not refute a finding of testamentary capacity

when it was otherwise evident that Mr. Ebner understood the nature and extent of his property, but merely needed assistance in accomplishing his goals.[10]

Appellee presented little evidence to rebut the presumption in favor of testamentary capacity, let alone disprove it. The primary evidence credited by the trial court concerning Mr. Ebner's mental state in October 2013 was Ms. Brown's testimony as to Mr. Ebner's demeanor during a surprise birthday party in early October 2013 (weeks prior to the October 24, 2013, meeting), during which she contends that Mr. Ebner was disheveled, lost focus, appeared confused, did not recognize a family member, stared off into space, and only responded to simple questions. We find this testimony to have little probative value on the issue of testamentary capacity. *See Weir's Estate*, 475 F.2d at 991 (noting that evidence showing testator "dressed conservatively, was occasionally forgetful, sometimes untidy . . . , and had some strange habits" to be "speculative and meaningless" in a challenge to testamentary capacity).

---

[10] We note also that Mr. Ebner's difficulty understanding complex matters was an issue that persisted throughout his life and not just during the timeframe in which he executed the 2013 will. The evidence demonstrated that, for years, he successfully managed his significant wealth and properties, albeit with assistance from others. Therefore, evidence that Mr. Brown and other family members assisted Mr. Ebner with his financial and business matters from 2000 onward would have the same evidentiary import with respect to any of the earlier testamentary documents in this case.

Importantly, the trial court credited Ms. Brown's testimony that, in executing a deed in 2010, she had to go "over it line-by-line with him" so that he understood. While it is unclear whether Mr. Ebner read or was read the 2013 will prior to signing it, or whether he fully understood all its terms, neither of these findings demonstrate a lack of testamentary capacity. Evidence concerning Mr. Ebner's understanding of the underlying testamentary document does not disprove testamentary capacity. Specifically, such evidence did not undermine the above-credited evidence that Mr. Ebner generally knew the property he owned, to whom he wanted to give it, or that he knew he was signing a will. For this reason, the trial court's reliance on Ms. Brown reading the 2010 deed to Mr. Ebner "line-by-line" is not determinative of his testamentary capacity.

As a legal matter, the trial court's ruling that the transfer-on-death deeds were valid supports our decision. "The capacity required to make . . . a transfer on death deed is the same as the capacity required to make a will." D.C. Code § 19-604.08 (2012 Repl. & 2019 Supp.). While a finding of capacity for a transfer-on-death deed is not sufficient alone to support a finding of testamentary capacity, in that the facts supporting capacity as to each will necessarily be different (i.e., the property, beneficiaries, and document involved), it is persuasive. Here, the trial court ruled that the deeds were valid, thereby affirming that Mr. Ebner had sufficient capacity

to make them, and neither party takes issue with that decision. The deeds transferred ownership of two of Mr. Ebner's properties upon his death to Ms. Govan, rather than Ms. Ebner, demonstrating Mr. Ebner's knowledge of his property and to whom it wanted to give it. The trial court noted that the transfer-on-death deeds were "consistent with what Mr. Ebner had been seeking to do all along" and that the deeds were not "so complex that he couldn't understand what [they] meant." While these findings do not necessarily require a finding of capacity, they lend support to the conclusion that with respect to the transfer-on-death deeds Mr. Ebner was able to understand his property, who would receive it, and the nature of the underlying transaction, providing a sufficient basis to support a finding of testamentary capacity with respect to the 2013 will.

Therefore, we conclude that the trial court erred in finding that Mr. Ebner lacked testamentary capacity because he did not read the 2013 will, have it read to him, or understand it. The preponderance of the evidence credited by the trial court requires a finding that Mr. Ebner had testamentary capacity: that on and around October 24, 2013, Mr. Ebner understood the nature of his property (money and real property), understood to whom he wanted to give it (including Ms. Govan, Ms. Brown, and Ms. Winters, among others), and understood that he was signing a will.

Therefore, we reverse the decision of the trial court that Mr. Ebner lacked testamentary capacity at the time he executed the 2013 will.[11]

## V.    Expert Designation

We find no error in the trial court's decision to admit Dr. Goldstein's expert testimony.  We review the trial court's admission of expert testimony for abuse of discretion, only disturbing that ruling if it is "manifestly erroneous."  *Dickerson v. District of Columbia*, 182 A.3d 721, 726 (D.C. 2018).  The "goal" of the trial court's role as a gatekeeper "is to deny admission to expert testimony that is not reliable," and to admit that which is "derived from reliable principles that have been reliably applied."  *Motorola, Inc. v Murray*, 147 A.3d 751, 755, 757 (D.C. 2016) (en banc).

---

[11] Appellant also argues that trial court erred in considering evidence that had "no temporal proximity" to the date the will was executed (evidence showing Mr. Ebner's sixth-grade education, the photograph from the October 2013 party, and Mr. Ebner's unspecified childhood trauma) because "the drafter of a will would not likely have been privy" to this information.  We review a trial court's decision to admit evidence for abuse of discretion.  *See Jackson v. George*, 146 A.3d 405, 420 (D.C. 2016).  While we analyze testamentary capacity at the time a testator executes a will, evidence of mental capacity preceding that date may be probative of a testator's capacity.  *See Barbour*, 4 App. D.C. at 548.  Whether and how much weight to afford that evidence is left to the factfinder.  *See In re H.R.*, 206 A.3d 884, 887 (D.C. 2019) (Under D.C. Code § 17-305(a), this court "review[s] the evidence in the light most favorable to the trial court's finding, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." (cleaned up)).  We find no abuse of discretion in the trial court's consideration of this evidence.

"While a physician need not be a specialist" in a particular field to provide expert testimony, "he or she must still be a qualified physician and have familiarity with the particular subject matter in order to render an expert medical opinion." *Dickerson*, 182 A.3d at 729. The trial court admitted Dr. Goldstein as an expert in internal medicine, and specifically nephrology, because of his knowledge and experience in those subject areas. We find no error in that decision. Appellant primarily challenges the evidentiary basis underlying Dr. Goldstein's expert opinion, such as his failure to speak with certain people or review certain records; the trial court properly understood these concerns as relevant to the weight to afford the opinion, rather than its admissibility. *See, e.g.*, *Russell v. Call/D, LLC*, 122 A.3d 860, 868 (D.C. 2015) (noting that "lack of textual support" supporting expert opinion, e.g., from peer-reviewed journals or data that provides the highest degree of certainty, "may go to the weight, not the admissibility of the expert's testimony"). Therefore, we will not disturb the trial court's decision here.

## VI.    Conclusion

We conclude that appellee Ms. Brown failed to establish that Mr. Ebner lacked testamentary capacity. We therefore reverse the decision of the trial court and vacate

its order denying appellant's request to admit the 2013 will to probate. We remand for further proceedings.

*So ordered.*